WILBUR F. STOREY *et al.*

*v.*

MARY WALLACE.

1. SLANDER—*proceedings of courts—privileged communications.* A faithful report of the proceedings of courts of justice, is a privileged publication, and shall not be held a cause of action for libel. It would appear that slanderous statements, made by witnesses, which are not pertinent to the matter under investigation, are not privileged. Nor is it settled that coroners' inquests may be for this purpose classed with judicial proceedings.

2. A statement made upon the authority of a newspaper, and not purporting to be a report of such proceedings, is not privileged. Responsibility can not be evaded by offer of proof that the libel was in fact matter in evidence.

3. Proprietors of newspapers, though ignorant, at the time, of the publication of libellous matter, are responsible.

4. ACCORD *and satisfaction—retraction.* The publication of a retraction satisfactory to the injured party does not constitute accord and satisfaction, or release claim for damages without express agreement to that effect.

5. MITIGATION *of damages.* Want of express malice may be shown, also that a retraction of the slander is made, in mitigation of damages, but the retraction must be effective.

6. EXCESSIVE DAMAGES—*setting aside verdict.* Except in a case of flagrant wrong, a verdict will not be disturbed, especially when the damages have been reduced upon a second trial.

APPEAL from the Circuit Court of Cook county; the Hon. HENRY BOOTH, Judge, presiding.

Messrs. WALKER, DEXTER & SMITH, for the appellants.

Mr. FRED. W. BECKER, for the appellee.

Mr. CHIEF JUSTICE LAWRENCE delivered the opinion of the Court:

This was an action for libel, brought by Mrs. Mary Wallace against the proprietors of the Chicago "Times," on account of the publication in that paper, on the 8th of September, 1868, of the following article:

### "OVER-DRINKING.

"James Wallace, a blacksmith by trade, forty years of age, but of late a saloon keeper at No. 133 Canal street, died suddenly at his saloon, in a fit, on Saturday, while sitting at breakfast. Wallace had formerly lived with his wife and family at Muskegon, Mich. In 1861 he enlisted, and was absent three years. On his return he was astounded to find an infant child in his wife's arms—progeny which he could not father. He left his wife, and has since that time drank very hard. At the time of his death he had been on a spree of a week's duration. An inquest was held yesterday at the saloon, and a verdict of 'died while in a fit of over-drinking.'"

The plaintiff resided in the State of Michigan, and, on seeing this article, proceeded to Chicago, and called at the "Times" office. She there saw the city editor, and after stating the falsehood of the paragraph, demanded its retraction. This was readily promised, and an article was at once written for that purpose and read to her. She said it was satisfactory, and, according to a witness for defendants, who was present at the interview, said a retraction was all she desired, though this last statement is denied by the plaintiff. This witness further testifies that she inquired if the retraction would be published the next day, and was told it would be. The next day was Sunday, and in the Sunday's edition of the "Times" the retraction was published, but it does not appear that it was

published or referred to, in any manner, in any subsequent paper. It is in proof that the Sunday "Times" is not a part of its regular issue; is not sent to the subscribers to the daily paper by virtue of such subscription, and has a much less circulation in the country than the regular edition of the paper. The plaintiff returned from this interview to her home in Michigan, and, as her daughter testifies, looked very eagerly for the promised retraction, but looked in vain, for the reason already given. On the 29th of the same month she commenced this suit.

The paragraph retracting the libel, and published in the Sunday "Times," was as follows:

"An item was inserted in the 'Times' a few days ago, which did great injustice to a worthy, hard working woman. At the inquest on the body of James Wallace, who died from the effects of intemperance, it was stated that the deceased had left his wife for the reason that he had come home from the army, after a three years' absence, and found a three months' old baby in her arms. Mrs. Wallace has evidence, in the form of an affidavit from her attending physician, Dr. S. W. Leonard, of Muskegon, Mich., that her husband was at home at the proper time, previous to the child's birth, and that she has the reputation of being an exemplary, hard working woman. The slur upon her character was, therefore, an unjust and unfounded one, for which the witness who uttered it was responsible."

There were three trials. On the first the jury found for the plaintiff a verdict for $3850, which the court set aside. On the second, the jury did not agree. On the third, the jury again found for the plaintiff, a verdict for $2500, and the court gave judgment.

The first ground assigned by appellants' counsel for reversing this judgment is, that the libellous paragraph was only a statement of the evidence given at the coroner's inquest, to

54 STOREY *et al. v.* WALLACE. [Sept. T.,

Opinion of the Court.

which reference is made in the article, and that its publication was therefore privileged.

It has become the settled law, both of England and of this country, that a faithful report of the proceedings of courts of justice is a privileged publication, and shall not be held a cause of action for libel. The courts consider the advantage to the community from such publication so great, that private inconvenience must yield to the general good. The English courts, however, have shown themselves disinclined to apply this rule to coroners' inquests, on the ground that the evidence upon such inquests is *ex parte,* and the proceedings decide nothing, and are but *quasi* judicial. *King* v. *Fleet,* 1 B. & Al. 380; *Duncan* v. *Thwaites,* 3 B. & C. 556; *Rex* v. *Fisher,* 2 Camp. 563. The authorities on this point are not, however, entirely harmonious.

While no case is cited on the other side so directly upon the point as those above quoted, yet the language used by several of the judges, in *Wason* v. *Walter,* 4 Law Rep. 73, and *Ryalls* v. *Leader,* 1 Law Rep. Exch. Cases, 296, is broad enough to apply the doctrine of privilege to inquisitions before a coroner. We shall not undertake to decide now whether, in this State, such inquests should be classed, for this purpose, with judicial proceedings, nor shall we determine another question suggested by counsel, whether, even if the publication of evidence given before a coroner is privileged, the privilege extends to slanderous statements made by witnesses, which are not pertinent to the matter under investigation. We will only remark, upon this last point, that it is difficult to see how the public is to be benefited from giving publicity to statements of that character, or upon what ground of public policy their publication is to be defended.

These questions may be passed over in this case, because the libellous paragraph does not purport, upon its face, to be a report of the evidence given upon the coroner's inquest. That the plaintiff was guilty of adultery, is stated as a fact on the authority of the newspaper, and not as evidence given upon

the inquest.   The imputation is then made, on the same authority, that this adultery of the wife caused her husband to leave his home, and led to his intemperate habits, and finally to his death.   After giving utterance to this monstrous libel, and giving it all the weight of its own authority, the paper states the fact that an inquest had been held, and what was the verdict.   It nowhere professes to give the evidence, or to base its statements upon it, and only by a remote inference would the reader suppose that the facts alleged in the paragraph were derived solely from the testimony before the coroner.

That this paragraph does not fall within the rule of privileged publications is, then, too plain for argument.   The newspaper was not professing to report evidence, but gave these statements to the public, upon its own responsibility, as true, and that responsibility it can not now evade.

Equally untenable with this is the next position of appellants' counsel, that the judgment should be reversed because the publication of the retraction, under the circumstances, was an accord and satisfaction.   The court below instructed the jury that, if the retraction was published with the understanding between the parties that its publication should be a satisfaction to the plaintiff of all causes of action on account of the alleged libel, the plaintiff could not recover.

Without pausing to inquire whether the plaintiff might not have justly complained of this instruction, if the verdict had been the other way, it is sufficient to say that the jury found there was no such agreement between the parties, and found rightly.   Giving to the evidence the most favorable construction for the defendants, it only shows that the plaintiff demanded a retraction from them, which they were very willing to make, on being satisfied they had been wrong, but does not show any stipulation or agreement that they were to be released from all claims for damages, as a condition of such publication.   The evidence shows what is far more honorable

to the defendants, that they published this retraction as a simple act of justice to the plaintiff, and not as a condition of their being discharged from liability. Its publication was a matter to be considered by the jury in mitigation of damages, and they were so instructed by the court, but it had no other bearing upon the action.

It is suggested by appellants' counsel, in the conclusion of their argument, though only suggested, that the judgment should be reversed because of excessive damages. It must be a case of flagrant wrong, one in which the jury has been manifestly led away by prejudice or passion, to justify a court in setting aside a verdict in an action for libel, on the mere ground of excessive damages, where there have been two verdicts for the plaintiff, and the first has been substantially reduced on the second trial. This is not a case of that character, and we can not reverse the judgment merely upon this ground.

The verdict is for $2500. The proof shows the "Times" newspaper to be worth $200,000. The libel, directed against a woman whose character, on the record, stands unassailed, was one of singular cruelty. True, there was a retraction, but a retraction in any case is but poor atonement for such a wrong, and, in this instance, of much less than ordinary value, because so published that it would never be seen by many readers of the libel, and perhaps seen by none in the neighborhood of the plaintiff's home.

It is said the plaintiff inquired, in her interview with the city editor, if it would be published the next day. The jury probably thought the plaintiff knew nothing of the Sunday edition, and that she referred to the next issue of that edition of the paper which contained the libel. They probably further considered that the city editor knew her residence, for she showed to him the certificate of character brought by her from Michigan, and must have known her object was to have the retraction receive the same publicity and circulation as the libel. He knew its publication in the

Sunday edition would not accomplish the purpose she had in view; and if he had been as anxious as he should have been to render all the atonement in his power for the wrong the paper had committed, he would have caused the retraction to be published on Monday, whether published on Sunday or not. While obeying the mere letter of the plaintiff's demand, he knew he was not meeting its spirit, and that the publication on Sunday alone was not the atonement she expected. These considerations, doubtless, occurred to the jury, and we can not say they gave them undue weight.

Doubtless, too, the jury, in determining the amount of their verdict, thought something was due to the protection of the public. The article in question, grossly libellous as it is, is of a kind lamentably frequent in the columns of American newspapers. There is probably no other country in the civilized world where private character has so little security against newspaper assault. The conductors of the press are neither better nor worse than other men, but they are singularly reckless in the exercise of their great power. The anonymous mode of its exercise blunts the sense of personal responsibility. In pandering to the morbid taste of their readers for personal and worthless gossip, they assail private character with contemptuous indifference, and are sometimes unwilling, and always unable, to fully redress the wrong. That is the nature of the case before us. Here was a cruel libel published merely to make a paragraph. Here was an explanation so published as to show that the persons having the matter in charge thought it of no moment that the retraction should receive the same publicity as the libel, though the latter had outraged the sensibilities and sullied the character of an innocent and unoffending woman. The jury probably intended to show, by their verdict, that persons who have been libellously assailed by the public press, need not resort to acts of violence, but can find redress by appealing to the laws. It would ill become this court to teach a different lesson.

The defendants in this case probably had no personal knowledge of either of these articles until their publication, but they must be held responsible as the proprietors of the paper.

The judgment of the court below is affirmed.

*Judgment affirmed.*