RICHARD S. WHITCOMB *vs.* THE HEARST CORPORATION
(and three companion cases[1]).

Suffolk.    January 7, 1952. — July 7, 1952.

Present: QUA, C.J., LUMMUS, RONAN, WILKINS, & WILLIAMS, JJ.

*Libel and Slander. Damages,* For tort, Mitigation. *Practice, Civil,* New trial, Judicial discretion, Damages.

An alleged libellous newspaper article which mistakenly identified one who in fact had had nothing to do with a proceeding before a military tribunal as one who had been found guilty of and sentenced for a serious offence in such proceeding was neither fair nor accurate and was not privileged as a report of a judicial proceeding, even assuming that the proceeding before the military tribunal would give rise to the same privilege as a proceeding in an ordinary court; and it was immaterial that the publisher of the newspaper exercised care to insure accuracy in the article.

If a newspaper publisher, the defendant in an action for libel, might have had a privilege in connection with alleged official military communications respecting the conviction and sentencing of an officer for a serious offence in a proceeding before a military tribunal, the publisher had no such privilege for an article concerning such proceeding which, although based on such communications, made no reference thereto but instead mistakenly stated the name of the plaintiff, who

---

[1] The companion cases are by the same plaintiff against Post Publishing Company, The Globe Newspaper Company, and Boston Herald-Traveler Corporation.

in fact had had nothing to do with the proceeding, as the name of the guilty officer and added biographical material plainly identifying the plaintiff as the person involved.

In an action for libel based on a newspaper article, it was not error to leave to the jury the whole matter of the extent of mitigation of damages through a full and conspicuously published retraction even though the instructions permitted the jury to find that there was no mitigation.

In actions for libel by a man of prominence and high reputation in civil and military life over many years against several newspaper publishers based on articles mistakenly identifying the plaintiff as an army officer who had been convicted of and sentenced for a serious offence by a military tribunal, there was, on the record, no abuse of discretion in the denial of motions by the defendants for a new trial based on the alleged ground that damages in large amounts awarded the plaintiff notwithstanding full and conspicuously published retractions by the defendants were excessive.

FOUR ACTIONS OF TORT. Writs in the Superior Court dated March 8, 1950.

The actions were tried before *Hurley,* J.

*Bailey Aldrich,* (*Francis P. Garland* with him,) for the defendants Boston Herald-Traveler Corporation and another.

*Francis T. Leahy,* for the defendant The Globe Newspaper Company.

*John J. Burns,* (*Gerald May* with him,) for the defendant The Hearst Corporation.

*Edward O. Proctor,* (*George C. Abernathy, Jr.,* with him,) for the plaintiff.

QUA, C.J. These are four actions for libel, all brought by the same plaintiff against the publishers of five Boston newspapers commonly known as the Advertiser, the Post, the Globe, the Traveler, and the Herald. The last two papers just named are both published by the same defendant, Boston Herald-Traveler Corporation. For convenience we shall hereinafter generally refer to the several defendants by the names of the newspapers respectively published by them.

The actions were tried together to a jury and resulted in verdicts for the plaintiff against the Advertiser for $20,000, against the Post for $10,000, against the Globe for $20,000, against the Traveler for $10,000 on the first count in the

declaration against Boston Herald-Traveler Corporation, and against the Herald for $5,000 on the second count in the declaration against Boston Herald-Traveler Corporation, making the total amount of all the verdicts $65,000. All of the defendants allege exceptions.

The plaintiff testified to some of the events of his life and to his past activities. The jury could find the following facts bearing upon his reputation and standing in the community: At the time of the trial he was fifty-six years of age. He graduated from college in 1915 and thereafter was physical director for two years in the Y. M. C. A. in Honolulu. While there he enlisted in the national guard in the infantry and rose to the rank of sergeant. In 1917 and 1918 he was second and first lieutenant of infantry, largely in Hawaii. He married in 1917. After the armistice he was recommissioned in the reserve. After the war he was in the steamship business in Panama until 1923 and then, following a number of months in New York, he returned to Kansas, where he had been born, and went to work for the Southwestern Telephone Company. In 1927 he was transferred to the American Telephone and Telegraph Company in New York city, where he worked until 1929. He took the usual tours of duty in the reserve of the army and was promoted to the rank of major. From 1929 until 1933 he lived in Winchester and was general sales manager of the northern area of the New England Telephone and Telegraph Company. In 1931 he organized the Boston unemployment relief campaign, predecessor of the community fund, which reached its goal of $3,000,000. He also took part in the campaign of 1933 and acted as adviser in the campaigns of 1934 and 1935. In 1933 he became division manager of the western division of the New England Telephone and Telegraph Company. This "was Massachusetts from the Concord line west and Vermont." In 1938 he was appointed by Mayor Tobin chairman of the municipal survey for the city of Boston, and in connection therewith he gave many talks and lectures. This survey was "credited" with saving the city $1,000,000. He also

talked before civic groups to arouse interest in the national defence act all over Massachusetts and up into the three northern States. In these activities he met a great many people, particularly in the community canvass. He also "acted for" the National Economic League and the Boston Council of Boy Scouts. In 1938 he was an unsuccessful candidate for the Republican nomination for Governor. In January, 1941, while living in Springfield, he again went on active military duty and was assigned to be chief of operations for water transport. He has had no permanent home since 1942. In June, 1941, he was sent by the general staff on a special mission to Iceland, where he arranged for the landing of troops, and where he remained as commander of the port of Reykjavik until 1943. Someone has "figured out" that he was "the first officer of the American Overseas Force to set foot on foreign soil in World War II." In 1943 he became a colonel. He next went to London as director of operations of "the 11th Major Port, the British Channel Ports, and was subsequently put in command." In 1944 he was "given the mission of operating the right sector of Omaha Beach." He "landed on the French Coast on D-day plus 2." He subsequently operated some additional ports which were still under shell fire and until June, 1945, operated Rouen, "the largest port in France." His headquarters were then "redeployed to the Pacific." He was sent to Manila "to try to straighten out the port which was congested with four hundred ships." In January, 1946, he returned to the United States and finished his active duty. At some of the ports above mentioned he commanded from about 8,000 to 12,000 troops and many thousands of civilian employees and prisoners. For his services he received several American and two French decorations. Upon returning to civil life, he has acted as "Management Official particularly in connection with the production of a medicine he was interested in." The "business was the Chalyon Corporation, a Massachusetts corporation operating principally in New York. . . ." He has been living at a hotel in Brooklyn. His two daughters are married, one living in

Vermont and one in Michigan. Since World War II he has been on "a great many periods" of active military service. He was last called into such service in September, 1950. Since 1948 he has held the rank of brigadier-general in the reserve corps. At the time of the trial he was "on extended active duty."

The libellous articles all stated in somewhat different forms that "Lt. Col." Richard S. Whitcomb[1] had been found guilty by a military court of removing valuable articles from a private house in Garmisch, Germany, and had been sentenced to two years hard labor and dismissed from the service. The first publication was in the Traveler on Saturday, March 4, 1950, and the publications in the other papers were in the Sunday editions of March 5. Each article contained, or was accompanied by, biographical material descriptive of the plaintiff which, although not always accurate in every respect, could clearly be found to refer to the plaintiff and to identify the plaintiff as in fact the person intended by the writer. The question which divided the court in *Hanson* v. *Globe Newspaper Co.* 159 Mass. 293, does not arise here. *Ellis* v. *Brockton Publishing Co.* 198 Mass. 538, 541. *Hubbard* v. *Allyn,* 200 Mass. 166, 171–172. *Sweet* v. *Post Publishing Co.* 215 Mass. 450, 453. The articles were unquestionably defamatory in character. No contention to the contrary is made. And the articles were not true, since the officer found guilty and sentenced in Germany was not the plaintiff, Richard *S.* Whitcomb, but was one Richard *F.* Whitcomb as to whom such parts of the articles as referred to conviction and sentence would have been true. The plaintiff had never been in Germany at any time.

The origin of the mistake appears from a pre-trial agreement which was read to the jury. On the morning of Saturday, March 4, "The Stars and Stripes," European Edition, the "Unofficial Publication of U. S. Occupation Forces in Europe," carried the story, using the name "Richard *S.*

---

[1] The article in the Traveler printed the name as "R. S. Whitcomb."

Whitcomb." The reporter for that paper had received his information over the telephone from the "Army Public Information Officer" in Augsburg, where the court martial had been held. The officer there used the correct middle initial "F," but due to a poor connection the reporter understood him to say "S." The reporter checked the name in the Munich military post telephone book "issued by the U. S. Army Signal Corps," which also erroneously gave the middle initial as "S." One Devlin, Associated Press correspondent at Munich, read the article in "The Stars and Stripes" and telephoned "the Army's Public Information Office headquarters" at Heidelberg and asked some questions as to Whitcomb's home town, how he had pleaded, and why he was tried at Augsburg. He was told that Whitcomb was a resident of Worcester, which may have been true of Richard F. Whitcomb, but not of the plaintiff. Devlin thereafter talked with the "Munich post of the Army Public Information Office" along the same lines. In neither conversation was it brought to Devlin's attention that the proper middle initial was "F" instead of "S." Nor does it appear that in either conversation he was misinformed about the middle initial. Thereafter Devlin sent the story out on the wire service of the Associated Press, with the initial "S," and the Boston papers received it. It appears from the record that the biographical matter definitely fixing the plaintiff as the person intended was added by the Boston papers themselves. It was agreed that the plaintiff did not claim actual malice, and no special damage was claimed.

Within a few days after the original publications all the papers conspicuously published full and complete retractions, acknowledging the mistake and wholly exonerating the plaintiff. The plaintiff makes no contention that any of these retractions was unsatisfactory.

The plaintiff further testified that when he read the defamatory articles "he simply felt that everything he had put his entire life into doing, his 34 years in the military service, and everything he had done had been taken away

from him at one moment; that everybody that knew him there at the time would brand him as a man who had been false to his oath and dismissed from the military service of the United States . . .''; that he was broken hearted; and that his damages were ''total and complete'' and ''not measurable in money.'' As to the retractions he testified that, although he wanted them and they were highly important, they ''didn't do a bit of good so far as his feelings were concerned,'' and that ''no matter how many retractions were made, they would not make him feel any better.''

With the foregoing background in mind, we may proceed to a discussion of the questions of law presented by the several defendants.

1. The defence of conditional privilege to publish judicial proceedings cannot prevail.[1] For purposes of this case we assume that proceedings before the military tribunal would give rise to the same privilege as if they had taken place before an ordinary civil or criminal court. See *Barrows* v. *Bell*, 7 Gray, 301, 311–316; *Conner* v. *Standard Publishing Co.* 183 Mass. 474, 479; *Kimball* v. *Post Publishing Co.* 199 Mass. 248. But among the conditions of the exercise of this privilege are the requirements that the publication be both fair and accurate. *Sweet* v. *Post Publishing Co.* 215 Mass. 450. *Thompson* v. *Boston Publishing Co.* 285 Mass. 344, 348–349. Restatement: Torts, § 611. A publication which identifies a person who had nothing to do with the proceedings as the one against whom the proceedings were directed can be neither fair nor accurate. *Sweet* v. *Post Publishing Co.* 215 Mass. 450, 453 (also a case of mistaken identity). For a collection of cases see 26 A. L. R. 454, 457.

Some stress seems to be laid upon the care which the defendants and the sources from which they derived their information exercised to insure accuracy. All this is immaterial. A newspaper is not obliged to publish reports

---

[1] Only the Advertiser and the Globe have argued any claim of privilege.

of a judicial proceeding and has no private interest to protect. If it does publish such reports, it must at its peril publish fairly and accurately. *Sweet* v. *Post Publishing Co.* 215 Mass. 450, 453–455.

2. Another contention is that, since, in some instances at least, reports and statements of administrative officers in the performance of their duty are absolutely privileged as to such officers, reports of army officers in the performance of their duties are similarly privileged, and consequently newspapers enjoy a qualified privilege to publish the substance of such official reports and statements. Cases cited in this connection include *Howland* v. *Flood,* 160 Mass. 509, *Conner* v. *Standard Publishing Co.* 183 Mass. 474, 478–479, and *Sheehan* v. *Tobin,* 326 Mass. 185. See Restatement: Torts, §§ 591, 611. See also *Spalding* v. *Vilas,* 161 U. S. 483; *Glass* v. *Ickes,* 73 App. D. C. 3; Annotation, 132 A. L. R. 1340; *Mellon* v. *Brewer,* 57 App. D. C. 126; Annotation, 53 A. L. R. 1526. The only official reports or statements in this case to which this contention can possibly apply are (1) information given by the army public information officers, (2) the article in "The Stars and Stripes," and (3) the military post telephone book. We need not determine how far the principle relied upon extends, or whether it includes official statements of army officers. See caveat following Restatement: Torts, § 591. It is hard to believe that, in any event, any of the statements referred to in (1), (2), and (3) above were of a character to bring them within the principle. But there are other answers to the argument. It is not shown that any false information was given by the army public information officers. Failure of the reporter for "The Stars and Stripes" to understand what was said because of a faulty telephone connection was not the giving of a false report by the information officer. It does not appear that other statements by information officers gave the erroneous middle initial. It does not appear that "The Stars and Stripes" itself was an official publication of the army. It has the appearance of a newspaper. In the box containing the names of its editors

it announces, "This is not an official publication of the U. S. Army." It describes itself in its mast head as "Unofficial Publication of U. S. Occupation Forces in Europe." The pre-trial agreement, by which the parties are bound (*Abbott* v. *Link-Belt Co.* 324 Mass. 673, 677), so describes it. In view of all this we would be going too far if we should say that every news item in this paper referring to anything done by any branch of the army was an official communication of the government and an "act of state"[1] and absolutely privileged as such. And it would certainly be going beyond reason to say that the Munich military post telephone book was a privileged official report, statement or communication which conferred immunity upon the American newspapers. See *Hyman* v. *Press Publishing Co.* 199 App. Div. (N. Y.) 609; *Bingham* v. *Gaynor*, 203 N. Y. 27, 32.

Moreover neither of the two papers claiming privilege proceeded in such a manner as to become entitled to a privilege in connection with these various statements, if such privilege might otherwise exist. None of them attempted to make a fair report of any official communication. Instead, they wrote their own articles in which they made no reference to the alleged official communications upon which they now rely to obtain a privilege, and in their own articles they went far beyond anything contained in these communications and embellished their articles with biographical matter plainly identifying the plaintiff as the culprit — a thing which the alleged official communications had not clearly done in spite of the mistaken initial. The articles published by the newspapers were not confined to fair and accurate reports of any communications from "The Stars and Stripes" or from any of the information officers. *Lewis* v. *Hayes*, 165 Cal. 527, 530–531. *State* v. *Sheridan*, 14 Idaho, 222, 235–236. *Storey* v. *Wallace*, 60 Ill. 51, 54–55. *Vosbury* v. *Utica Daily Press Co.* 105 Misc. (N. Y.) 134. *Ilsley* v. *Sentinel Co.* 133 Wis. 20, 27–28. *Hughes* v. *Washington Daily News Co.* 193 Fed. (2d) 922.

---

[1] *Chatterton* v. *Secretary of State for India in Council*, L. R. [1895] 2 Q. B. 189, 192, 193, 194.

3. All of the defendants contend that there was error in the charge to the jury as to the effect of the retractions. The judge said to the jury, "Having determined that [the extent to which the plaintiff was damaged by the defamatory articles], you determine to what extent any retraction that was published minimized or mitigated the damages which he sustained. It is within your province to say that the retractions, the corrections, the apologies mitigated his damages entirely, down to a nominal degree. It is within your province to say that the retractions, corrections, the apologies, mitigated it in no degree. Or you can say that it mitigated it to some extent, you determining the amount of it." The exceptions are to the statement that the jury might find that the retractions mitigated the damages "in no degree." This statement must of course be taken in connection with the rest of the charge on the subject as quoted above, from which it appears that the judge left to the jury the whole matter of the extent of mitigation, including both maximum and minimum. The defendants' argument, briefly stated, is that prompt, "highly important," and satisfactory retractions, conspicuously published, must of necessity mitigate the damages to *some* extent, and so it was error to allow the jury to find that there was *no* mitigation. Considered wholly as bearing upon a question of fact, the argument has weight. And yet we are not prepared to say that there was error of law in leaving the whole matter to the jury. The retractions were affirmative defences as to damages, with the burden of proof upon the defendants to convince the jury of the extent to which the damages had been mitigated. See G. L. (Ter. Ed.) c. 231, § 93, as appearing in St. 1943, c. 360; *Ellis* v. *Brockton Publishing Co.* 198 Mass. 538. It was for the jury to say what that extent was. If the judge could not properly do what he did do, the alternative would seem to be that he must tell the jury that they must find *some* mitigation or possibly *some substantial* mitigation. But he could not intimate how much or argue in favor of large mitigation and small verdicts. The instruction just suggested, whichever way it might

have been phrased, when analyzed, would mean at most only that the jury must find mitigation by something more than a merely nominal amount; that is to say, by more (but perhaps only $1 more) than some trifling sum comparable to what might be allowed to a plaintiff as nominal damages. Even if the instruction was not absolutely correct, verdicts ought not to be upset because of an instruction departing from literal exactness in no greater degree than this. *Perry* v. *Manufacturers National Bank*, 315 Mass. 653, 658–660. See *Bishop* v. *Journal Newspaper Co.* 168 Mass. 327, 332; *Abell* v. *Cornwall Industrial Corp.* 241 N. Y. 327, 335; *Taylor* v. *Hearst*, 107 Cal. 262.

But we think that the instruction was entirely correct. It is true that in contract cases and some others a plaintiff who makes out a case is entitled to nominal damages, even if he has suffered no actual damage; but where the question is one of mitigation of damages we are not familiar with any rule which requires at least nominal mitigation. No case has been cited to us, and we have discovered none, which supports the defendants' position. On the contrary, general statements occur with some frequency and without qualification that mitigation by reason of retraction raises a question for the jury. *Taylor* v. *Hearst*, 107 Cal. 262, 272. *Behrendt* v. *Times-Mirror Co.* 30 Cal. App. (2d) 77, 88–89. *Storey* v. *Wallace*, 60 Ill. 51, 56. *White* v. *Sun Publishing Co.* 164 Ind. 426, 428. *Tresca* v. *Maddox*, 11 La. Ann. 206, 208. *Post Publishing Co.* v. *Butler*, 137 Fed. 723, 728. See 13 A. L. R. 794. In *Ellis* v. *Brockton Publishing Co.* 198 Mass. 538, at page 542, it is said that "The publication of a retraction, complete in character and conspicuous in position, *might be found* to have a material effect in diminishing the mischief caused by the libel, and thus substantially reduce the damages sustained by the person libelled" (emphasis supplied).

4. All defendants except the Post saved exceptions to the denial of their several motions for new trial, and now argue these exceptions on the ground that the verdicts were excessive. When considered in the aggregate the total

recovery of the plaintiff seems large, especially in view of the numerous and complete retractions prominently published. But the jury and the trial judge saw and heard the plaintiff. From his testimony they could find that he was a man widely known and of much prominence in civil and military life for many years and that he had been entrusted with many heavy responsibilities in both fields. They could find that he enjoyed a substantial and valuable reputation which had been injured to an important degree. If they believed his testimony they could find that the articles had inflicted upon him severe mental suffering. They were in a position, in which we are not, to judge of the sincerity of his claims in this respect. An argument is based upon the differences in the amounts of the several verdicts, which, it is said, do not correspond with the evidence as to the extent of harm likely to have been done by the several publications. But there were numerous differences among the several articles in length, character of headlines, position in the paper, and reference to the plaintiff's family, as well as in respect to the extent of circulation. Some of the articles were accompanied by a picture of the plaintiff and some were not. There were also differences in the retractions. It is not for us to undertake a minute appraisal of all these differences.

On all the evidence we are not satisfied that the damages in any instance were so great that to allow the verdict to stand exceeded the limits of the discretion of the trial judge as defined in our decisions. *Davis* v. *Boston Elevated Railway*, 235 Mass. 482, 501–502. *Murnane* v. *MacDonald*, 294 Mass. 372. *Palma* v. *Racz*, 302 Mass. 249. *Kinnear* v. *General Mills, Inc.* 308 Mass. 344, 348–349. *Bartley* v. *Phillips*, 317 Mass. 35, 38–44. *Hartmann* v. *Boston Herald-Traveler Corp.* 323 Mass. 56, 59–61.

5. We have not dealt separately with each exception taken by each defendant. Most of the exceptions are covered by what has been said. All that have been argued have been examined with care. We do not find error in any of them.

6. In each case the entry will be             *Exceptions overruled.*