JOHN J. STONE vs. ESSEX COUNTY NEWSPAPERS, INC.

Essex.    January 10, 1974. — May 6, 1974.

Present: TAURO, C.J., REARDON, QUIRICO, BRAUCHER, HENNESSEY, KAPLAN, & WILKINS, JJ.

*Libel and Slander.    Constitutional Law*, Freedom of speech and press, Libel.  *Malice.    Damages*, For libel.  *Words*, "Actual malice," "Reckless disregard."

A publication erroneously indicating that one was the owner of a narcotic drug might warrantably be found to be defamatory of him. [249-250]
In an action for libel against the proprietor of a newspaper based on a published account of a criminal case in a court involving a narcotic

drug, the defendant properly could be found not entitled to the common law privilege for a report of a judicial proceeding where the account erroneously stated that the testimony indicated that the plaintiff was the owner of the narcotic drug and so was neither fair nor accurate. [250]

In an action for libel against the proprietor of a newspaper based on a published account of a criminal proceeding in a District Court involving a narcotic drug, where it appeared that the plaintiff, although present in the court during the proceeding, was in no way involved therein and that the newspaper account erroneously stated that the testimony indicated that the plaintiff was the owner of the narcotic drug, it was held that the court proceeding was an event of public or general concern and that the First Amendment of the Federal Constitution through the Fourteenth Amendment precluded recovery unless there was "actual malice" in the publication [250-252]. QUIRICO, J., joined by TAURO, C.J., dissenting.

Discussion of "actual malice" in the law of libel. [252-254]

Evidence that an editor of a newspaper was "surprised" at a story written by a reporter known by the editor to be inexperienced, which falsely attributed ownership of a narcotic drug to one whom the editor knew well and considered to be an "excellent citizen," and that after a day's delay the editor allowed the story to be published would warrant findings that the editor entertained serious doubts as to the accuracy of the story, that in allowing the story to be published in the circumstances he was reckless, and that the publication was with "actual malice." [255]

Discussion of damages for libel. [256-257]


TORT. Writ in the Superior Court dated January 22, 1970.

The action was tried before *Chmielinski, J.*

*Philip M. Cronin (John P. Fitzgerald* with him) for the defendant.

*John C. Stevens, III,* for the plaintiff.

HENNESSEY, J.    The plaintiff had a jury verdict in a tort action for libel. The case is before us on the defendant's outline bill of exceptions. The facts are as follows.

On November 4, 1969, Jeffrey C. Stone, the then twenty year old son of the plaintiff, appeared in District Court charged with being present where narcotic drugs were illegally kept and with illegal possession of narcotics. A tablet alleged to be a "harmful drug" was introduced in evidence. The city marshal, Robert F. Jones, testified that

the other defendants in the District Court case had indicated to him that the defendant Stone was the owner of the harmful drug.

The plaintiff from 1963 to 1972 served on the Newburyport Redevelopment Authority, owned a catering business, and was food service director for the Newburyport schools.

Anthony Pearson, a reporter for the defendant's newspaper, The Newburyport Daily News, was in court covering the proceedings. He was a reporter who had been at work only four months and had received only several hours of instruction in the work. He was sitting in the back of the court room because he was unaware that there was a reporter's table near the witness stand. He had trouble hearing some of the witnesses, including Jones.

Pearson understood Jones's testimony to be that "Mr. Stone"[1] was the owner of the "harmful drug," and inferred that the title "Mister" was used to distinguish the father, who was in the court room, from the son.

That evening, Pearson wrote his story on the trial, translating the "Mr. Stone" of his notes to "John J. Stone," which he had discovered the father's name to be. He submitted it to William Coltin, the editor who ordinarily checked over and edited his copy. Coltin testified that he read it about midnight and was "surprised" at the information about the plaintiff (whom he had known for twenty years and whom he considered an "excellent citizen"), but accepted it as the testimony of a reliable public official under oath. He "may have" been surprised enough to question Pearson but did not see the reporter's notes on the story; he very rarely went back to check notes. The article, which had been written for inclusion on the fifth, was crowded out and its publication postponed for twenty-four hours. During that time Coltin did not communicate any concern about the story to his superiors.

---

[1] This point was contested at the trial. One of Pearson's supervisors testified that the reporter's notes did say "Mr. Stone." Jones testified he did not believe he used the term "Mister." The plaintiff testified he did not hear the term used.

There also was evidence from which the jury could infer that police testimony was produced in the District Court proceeding to show that the substance in question was not a harmful drug or narcotic, and that Pearson's notes and the news story did not include an account of that testimony.

The article was published on November 6. Shortly after it reached the public the plaintiff called Coltin to complain of its inaccuracy. Coltin discussed the matter with John J. O'Neil, the managing editor, and then checked with Jones and discovered the plaintiff had had nothing to do with the case. O'Neil next consulted the editor and general manager of the paper, and then called the plaintiff and discussed on which page a retraction would be printed. O'Neil offered to get the plaintiff's approval of the retraction before printing it and they met the next morning for that purpose. The plaintiff "said it was fine but the damage had already been done."

The defendant's exceptions are addressed to the judge's denial of its motion for a directed verdict and to alleged errors in the judge's instructions to the jury. Exceptions to the charge relate particularly to the issue whether the news article was defamatory; to the common law privilege of news media in the Commonwealth to report judicial proceedings, including inherent falsehoods, fairly and accurately; and to the constitutional aspects of the case. The judge ruled that the standards enunciated in *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964), were inapplicable. He charged the jury in substance, that a verdict for the plaintiff was warranted on proof, without more, of publication by the defendant of a falsehood which was defamatory of the plaintiff.

We conclude that there was no error in the refusal to direct a verdict, but there was error in the instructions as to constitutional aspects. Consequently, we sustain the defendant's exceptions and order a new trial.

1. We turn first to a consideration of the instructions to the jury. The defendant's preliminary argument, which is apposite to the directed verdict issue as well as to the instructions, is that the article did not charge the plaintiff

with a crime as it only referred to his ownership of the drug, and the crime, if any, would have been in its sale or giving away. This argument avails the defendant nothing. While an imputation of crime is defamatory per se, *Lynch* v. *Lyons*, 303 Mass. 116, 118-119 (1939), the general test for libel is much broader: written words which would tend to hold the plaintiff up to scorn, hatred, ridicule or contempt, in the minds of any considerable and respectable segment in the community. *Ingalls* v. *Hastings & Sons Publishing Co.* 304 Mass. 31 (1939). The judge's charge clearly and properly left these issues to the jury, who were instructed to consider damages only if they found the publication libellous, either for imputing crime or otherwise harming the plaintiff's reputation.

2. The defendant excepted to the judge's failure, in instructing on the issue of the common law privilege for reports of a judicial proceeding, to charge that the accuracy required to claim the privilege is substantial accuracy and does not require correctness in all particulars. *Thompson* v. *Boston Publishing Co.* 285 Mass. 344, 348-349 (1934). We find no error. The standard supplied by the trial judge, "fair and accurate report," was at least as favorable to the defendant as it had any right to expect. We have previously held that accuracy is required "at least in regard to all material matters." *Sweet* v. *Post Publishing Co.* 215 Mass. 450 (1913). Our statement in another mistaken identity case is almost directly applicable here: "A publication which identifies a person who had nothing to do with the proceedings as the one against whom the proceedings were directed can be neither fair nor accurate." *Whitcomb* v. *Hearst Corp.* 329 Mass. 193, 199 (1952). The jury were wholly warranted in concluding that this privilege did not apply.

3. There was error in the judge's instructions on the constitutional aspects of the case.

We appreciate that we are dealing here with conflicting interests. On the one hand, the tort law of this Commonwealth has long recognized a right of redress to one who suffers injury to his reputation by the publishing of a

defamatory falsehood. On the other hand, freedom of expression is guaranteed through the Fourteenth Amendment, and ultimately the First Amendment, of the United States Constitution. A balancing of values is necessary.

Where the news media and their representatives are defendants in libel cases, it is established beyond dispute that special consideration for free speech values is required. "[T]o insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones." *St. Amant* v. *Thompson,* 390 U. S. 727, 732 (1968). The suggestion has been made that the Constitution provides absolute protection for the press, even for knowing publication of falsehoods, but this suggestion has been rejected.[2] As a result, the issue has become, in what circumstances the news media will forfeit the First Amendment protection: whether for publication of falsehoods without fault, or for negligent, reckless or intentional publication.

A limitation on the power of State courts to award damages in libel actions has clearly been established by the United States Supreme Court. Public officials cannot recover damages against critics of their official conduct without proof of actual malice in the publishing. *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 283 (1964).

Subsequent to the *New York Times Co.* case, the Supreme Court, in a plurality opinion, decided that the actual malice standard applied not only to criticism of the official conduct of a public officer but also to the reporting of an event of public or general concern. *Rosenbloom* v. *Metromedia, Inc.* 403 U. S. 29, 44 (1971). Thereafter, we set the standard in this Commonwealth for invoking the First Amendment privilege for libellous material printed without actual malice by holding that the relevant issue is not

---

[2] *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 293 (1964) (Black, J., concurring). *Garrison* v. *Louisiana,* 379 U. S. 64, 80 (1964) (Douglas, J., concurring). *Curtis Publishing Co.* v. *Butts,* 388 U. S. 130, 170 (1967) (Black, J., concurring and dissenting). The majority of the court, however, declined to go that far.

the particular plaintiff involved, but rather the events which were the subject of the publication. *Priestley* v. *Hastings & Sons Publishing Co. of Lynn*, 360 Mass. 118, 122-123 (1971). See *Twohig* v. *Boston Herald-Traveler Corp*. 362 Mass. 807, 808-809 (1973).

The judge here ruled that United States Supreme Court cases limiting the constitutionally permissible reach of the law of defamation in cases involving communications media were inapplicable to the facts of this case. He charged the jury accordingly. This was error. Clearly, the judicial proceeding which was reported was an event of public or general concern.[3] Not only was it a trial of criminal complaints but the alleged crimes involved the presence of narcotic drugs in the community. The fact that the plaintiff was in no way a participant in this event was irrelevant. Cf. *Gertz* v. *Robert Welch, Inc*. 471 F. 2d 801 (7th Cir. 1972), cert. granted 410 U. S. 925 (1973). Therefore proof of actual malice was required.

4. We turn now to a consideration of the meaning of "actual malice," and the question, as raised by the defendant's motion for a directed verdict, whether there was evidence of actual malice for the jury's consideration in this case.

Mr. Justice Harlan's plurality opinion in the earlier case of *Curtis Publishing Co*. v. *Butts*, 388 U. S. 130, 155 (1967), had allowed recovery, at least for a "public figure" who was not a public official, on a showing of "highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." This language implies an objective test and a requirement of something less than recklessness. This requirement fell short of actual malice

---

[3] In view of our disposition of the case, we do not consider the effect of the fact that the plaintiff was a public officer. The defendant was not a critic of the plaintiff's official conduct, as in *New York Times Co*. v. *Sullivan*, 376 U. S. 254, 283 (1964), and *Rosenblatt* v. *Baer*, 383 U. S. 75, 87 (1966). Unlike the plaintiffs in *Monitor Patriot Co*. v. *Roy*, 401 U. S. 265, 271 (1971), and *Ocala Star-Banner Co*. v. *Damron*, 401 U. S. 295, 299 (1971), he was not at the time a candidate for public office. His public position seems irrelevant to the defendant's article, but we cannot with confidence say that the Supreme Court would permit a distinction on that ground.

and was never adopted by a majority of the court, however.
Cf. *Gertz* v. *Robert Welch, Inc.* 471 F. 2d 801, 806, fn. 11
(7th Cir. 1972). In any event, at least, the rule of the *Curtis
Publishing Co.* case has no applicability in a case con-
cerned with reporting on the official conduct of a public
officer (*New York Times Co.* v. *Sullivan,* 376 U. S. 254
[1964]), or on a matter of public interest. *Rosenbloom* v.
*Metromedia, Inc.* 403 U. S. 29 (1971).

Actual malice is proved, not necessarily in terms of ill
will or hatred, but by showing that the defamatory false-
hood was published with knowledge that it was false or with
reckless disregard of whether it was false or not. See *New
York Times Co.* v. *Sullivan, supra,* at 279-280 (1964).
"[D]efeasance of the privilege is conditioned, not on mere
negligence, but on reckless disregard for the truth." *Garri-
son* v. *Louisiana,* 379 U. S. 64, 79 (1964).

" 'Reckless disregard,' it is true, cannot be fully encom-
passed in one infallible definition. . . . [H]owever . . . [t]here
must be sufficient evidence to permit the conclusion that
the defendant in fact entertained serious doubts as to the
truth of his publication. Publishing with such doubts shows
reckless disregard for truth or falsity and demonstrates
actual malice." *St. Amant* v. *Thompson,* 390 U. S. 727, 730-
731 (1968). The test is thus entirely a subjective one. That
information was available which would cause a reasonably
prudent man to entertain serious doubts is not sufficient.
To negate the privilege the jury must find that such doubts
were in fact entertained by the defendant, or by the
defendant's servant or agent acting within the scope of his
employment. They may, of course, reach this conclusion on
the basis of objective evidence; it would perhaps be rare for
a defendant in such a circumstance to admit to having had
serious, unresolved doubts. But the conclusion must be
reached in order to hold the defendant liable.

As the constitutionally mandated standard of reckless-
ness in this civil context thus requires *actual* malice,[4] it is

---

[4] "It may be that jury instructions that are couched only in terms of knowing or
reckless falsity, and omit reference to 'actual malice,' would further a proper
application of the *New York Times* standard to the evidence." *Rosenbloom* v.
*Metromedia, Inc.* 403 U. S. 29, 52, n. 18 (1971).

conceptually narrower than the Massachusetts common law concept of recklessness sufficient to impose criminal liability, e.g., in a homicide case. In the criminal law we have held that an objective standard of recklessness and thus proof of *implied* malice will suffice, and said of a defendant that though " '. . . in fact he did not realize the grave danger, he cannot escape the imputation of wanton or reckless conduct in his dangerous act or omission, if an ordinary normal man under the same circumstances would have realized the gravity of the danger. . . .' " *Commonwealth* v. *Welansky*, 316 Mass. 383, 398-399 (1944). *Commonwealth* v. *Pierce*, 138 Mass. 165 (1884). Cf. Am. Law Inst., Model Penal Code, Proposed Official Draft (May 4, 1962) § 2.02 (2) (c).

Subsequent decisions, both in this court and in the United States Supreme Court, adopt and apply the formulation in the *St. Amant* case. *Twohig* v. *Boston Herald-Traveler Corp.* 362 Mass. 807 (1973). *Time, Inc.* v. *Pape*, 401 U. S. 279 (1971). The test for forfeiture of the privilege is uniform and, like that for its application, is unrelated to whether the plaintiff is a " 'public official,' 'public figure,' or 'little man.' " *Rosenbloom* v. *Metromedia, Inc.* 403 U. S. 29, 52, fn. 18 (1971).

5. In reviewing the denial of the defendant's motion for a directed verdict we consider the evidence in the light of this concept of actual malice. Thus we are faced with the issue whether the evidence adduced at trial constituted sufficient proof of the requisite state of mind for recklessness so as to warrant the jury in returning a verdict for the plaintiff. *Rosenbloom* v. *Metromedia, Inc., supra,* at 52 (1971). Despite evidence of what the jury could find to be gross carelessness on the part of Pearson, we do not believe that the evidence warranted a conclusion of recklessness on his part. Of course, we have no way of knowing what the evidence at a new trial may show as to his state of mind.

In any event, we hold that there was sufficient evidence to warrant a conclusion that the defendant's news editor, Coltin, allowed the story in question to be printed despite serious doubts as to its accuracy with respect to the

plaintiff. Coltin admitted he was "surprised" by the report of the plaintiff's involvement. He denied that this term was an understatement and stated that he accepted the reported testimony of the city marshal. Nevertheless, combining this admission with his testimony that he considered the plaintiff, whom he knew well, to be an "excellent citizen," and the fact that the article was written by an inexperienced reporter, of whose minimal training Coltin was fully aware, a jury might draw the inference that the news editor had in fact entertained doubts as to the story's accuracy. The detailed evidence of Coltin's knowledge of the plaintiff's reputation and character, all of which evidence could be found to be inconsistent with the nature of the crime charged, might well support such a finding.

Assuming a jury so found, the amount of time necessary and available for checking the accuracy of the story might be considered relevant to determine whether pushing aside or disregarding those doubts rose to the level of recklessness. In this regard, there was evidence of a delay of a full day in the publication of the story. Cf. *Priestley* v. *Hastings & Sons Publishing Co. of Lynn*, 360 Mass. 118, 123-125 (1971), and *Curtis Publishing Co.* v. *Butts*, 388 U. S. 130, 159 (1967). All told, there was sufficient evidence to warrant consideration by the jury. Therefore, it is appropriate for us to order a new trial of the case, rather than order that judgment should enter for the defendant.

6. The *Rosenbloom* opinion, at p. 52, speaks of the necessity for "clear and convincing proof" in such a case, and the *New York Times Co.* opinion, at pp. 285-286, calls for "convincing clarity" of proof. We think it advisable to comment that, in our view, these expressions are not intended to vary the usual measure of the plaintiff's burden of proof. Proof by a fair preponderance of the evidence is still the requirement. The "convincing clarity" and "clear and convincing" concepts are not a necessary or appropriate part of the instructions to the jury in a case such as the instant one. It seems evident that these phrases were used by the Supreme Court with reference to the necessity for proof of at least recklessness, and not mere negligence,

in publication. As such they relate only to the judge's consideration of the issues raised by a motion for a directed verdict.

7. Since we have determined to order a new trial, it is appropriate that we should address ourselves to the suggestion that excessive and unbridled jury verdicts can, themselves, infringe First Amendment values by promoting apprehensive self-censorship in the news media. See the dissenting opinions of Justices Harlan and Marshall in *Rosenbloom* v. *Metromedia, Inc.* 403 U. S. 29 (1971). While the majority of the Supreme Court have not as yet articulated any constitutional limit on libel damage judgments, the seriousness of the problem behooves us to examine closely the permissible limits under our own State law.

In a case of defamation the plaintiff's recovery is limited to actual damages, which are compensatory for the wrong done by the defendant. *Ellis* v. *Brockton Publishing Co.* 198 Mass. 538 (1908). Where specific harm is alleged to have resulted from the tort, it may be pleaded and damages recovered. *Muchnick* v. *Post Publishing Co.* 332 Mass. 304 (1955). Cf. *Lewis* v. *Vallis,* 356 Mass. 662 (1970). Otherwise the plaintiff is limited to general damages, which include mental suffering, *Chesley* v. *Tompson,* 137 Mass. 136, 137 (1884); *Pion* v. *Caron,* 237 Mass. 107, 111 (1921), and harm to reputation. *Ellis* v. *Brockton Publishing Co., supra.* Punitive damages are never allowed, *Ellis* v. *Brockton Publishing Co., supra,* even after proof of actual malice. G. L. c. 231, § 93, as appearing in St. 1943, c. 360. The defendant may introduce evidence of a retraction in mitigation of damages, G. L. c. 231, § 94, as amended by St. 1943, c. 361, but the degree of mitigation, if any, is for the jury. *Whitcomb* v. *Hearst Corp.* 329 Mass. 193 (1952).

Mr. Justice Harlan, in his dissent in the *Rosenbloom* case, 403 U. S. at 62 (1971), refers to the threat that excessive libel damage judgments pose to First Amendment values and suggests "that it is impermissible, given the substantial constitutional values involved, to fail to confine the amount of jury verdicts in such cases within any

ascertainable limits" (at 64). Cf. *Curtis Publishing Co.* v. *Butts*, 388 U. S. 130 (1967) (Black, J., dissenting at p. 170). The problem is certainly less severe in this Commonwealth, as punitive damages may not be assessed, but it is by no means absent. Chief Justice Shaw, in *Treanor* v. *Donahoe*, 9 Cush. 228 (1852), stated, "These are damages not measurable by any standard, but capable, in many instances, of producing the severest suffering, yet, in others, cause little or no actual injury" (at 230). The indefiniteness of the degree of the harm caused by a libel increases the risk that damages which in theory are only compensatory will in practice be awarded by outraged jurors to punish the defendant.

Such a practice would upset the delicate balance between the conflicting interests protected by the common law of libel and constitutional cases such as *New York Times Co.* v. *Sullivan*, 376 U. S. 254 (1964). To prevent this occurrence both trial and appellate judges must be vigilant in charging juries and reviewing verdicts to see that damages are no more than compensatory. Thus, while Chief Justice Shaw's solution to the difficulty of measuring libel damages, that "the court will be slow to pronounce a verdict excessive," *Treanor* v. *Donahoe, supra,* at 231, remains valid for purely private libel cases, it has far more limited applicability where freedom of the press is at stake. Cf. *Curtis Publishing Co.* v. *Butts,* 388 U. S. 130, 138 (1967); *Rosenbloom* v. *Metromedia, Inc.* 403 U. S. 29, 40 (1971).

8. The defendant's exceptions are sustained and the case is remanded to the Superior Court for a new trial on all issues.

*So ordered.*


QUIRICO, J. (dissenting, with whom Tauro, C.J., joins). A brief statement of the facts material to this opinion may be helpful. On November 4, 1969, the plaintiff's adult son, Jeffrey C. Stone, was tried in the District Court on a charge of illegal possession of drugs, and at the same time Jeffrey and two other persons were tried on charges of being present

where narcotic drugs were illegally kept. The city marshal of Newburyport, who acted as chief of police, testified that the two defendants other than Jeffrey indicated to him that a drug found at the time and place of arrest belonged to Jeffrey. A newspaper account of the trial contained in The Newburyport Daily News, published by the defendant, on November 6, 1969, stated that the marshal had testified that "the defendants [other than Jeffrey] had indicated to him that John J. Stone, father of defendant Jeffrey Stone, was the owner of the 'harmful drug.' " The officer had given no such testimony and had not made any reference to Jeffrey's father.

The plaintiff, John J. Stone, brought this action for libel against the defendant, and a jury returned a verdict in his favor in the amount of $7,500. Today the court has set aside that verdict and ordered the case remanded to the Superior Court for a new trial on all issues. The court has based its reversal on several decisions of the United States Supreme Court and particularly *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964), and *Rosenbloom* v. *Metromedia, Inc.* 403 U. S. 29 (1971), which established "[a] limitation on the power of State courts to award damages in libel actions" involving "criticism of the official conduct of a public officer . . . [and] also . . . the reporting of an event of public or general concern."[1] This limitation is stated in the *Rosenbloom* case to be "that a libel action . . . by a private individual against a licensed radio station [or a newspaper] for a defamatory falsehood . . . relating to his involvement in an event of public or general concern may be sustained only upon clear and convincing proof that the defamatory falsehood was published with knowledge that it was false or

---

[1] The basis of the reversal is clear from the following language of the court: "The judge here ruled that United States Supreme Court cases limiting the constitutionally permissible reach of the law of defamation in cases involving communications media were inapplicable to the facts of this case. He charged the jury accordingly. This was error. Clearly, the judicial proceeding which was reported was an event of public or general concern. Not only was it a trial of criminal complaints but the alleged crimes involved the presence of narcotic drugs in the community. The fact that the plaintiff was in no way a participant in this event was irrelevant" (footnote omitted).

with reckless disregard of whether it was false or not." 403 U. S. at 52.

I dissent from the decision of the court for the reasons discussed below.

1. I am unable to agree with the flat statement of the court that "[c]learly, the judicial proceeding which was reported was an event of public or general concern," whether the statement is intended as a finding of fact or ruling of law. Unless it be the law that every judicial proceeding is automatically an event or issue of public concern, a view of the law which I cannot accept as accurate, then at some point in the trial of this libel action it was necessary that a decision be made on the question whether the defendant's allegedly libelous publication related to "an event of public or general concern." The trial judge made none, and his instructions to the jury did not place on them the responsibility to do so. I do not reach the question whether such decision as a general rule may be made by this court because there is nothing in the record before us on which it could be based. See *Lewis* v. *Vallis,* 356 Mass. 662, 668 (1970). In this respect the case differs from *Priestley* v. *Hastings & Sons Publishing Co. of Lynn,* 360 Mass. 118 (1971), where the public nature of the controversy commented on by the defendant newspaper was evident from the record on appeal. I do not believe that this court can today take judicial notice of whether the trial of the plaintiff's son was "an event of public or general concern" in Newburyport in November, 1969.

Both the necessity and the difficulty of making such a decision appear to have prompted the following statement by Mr. Justice Marshall in his dissenting opinion in the *Rosenbloom* case: "In order for particular defamation to come within the privilege there must be a determination that the event was of legitimate public interest. That determination will have to be made by courts generally and, in the last analysis, by this Court in particular. Courts, including this one, are not anointed with any extraordinary prescience." *Rosenbloom* v. *Metromedia, Inc., supra,* at 79.

The court does not state or discuss any reasons for concluding that the judicial proceeding involved in this case was "an event of public or general concern," beyond the statement that "[n]ot only was it a trial of criminal complaints but the alleged crimes involved the presence of narcotic drugs in the community," and it cites no judicial precedent in support thereof. The *Rosenbloom* case is not such a precedent because there, as the court pointed out, the "[p]etitioner concede[d] that the police campaign to enforce the obscenity laws was an issue of public interest, and, therefore, that the constitutional guarantees for freedom of speech and press imposed limits upon Pennyslvania's power to apply its libel laws to compel respondent to compensate him in damages for the alleged defamatory falsehoods broadcast about his involvement." 403 U. S. at 40. Because of that concession the court did not attempt to set forth any guidelines for determining what is or is not "an event of public or general concern"; rather, it considered it sufficient to say that "the determinant whether the First Amendment applies to state libel actions is whether the utterance involved concerns an issue of public or general concern, *albeit leaving the delineation of the reach of that term to future cases*" (emphasis supplied). 403 U. S. at 44-45. I have found no cases decided by the Supreme Court since the *Rosenbloom* decision which shed any further light on the meaning of the term "an event of public or general concern."

However, one conclusion which does seem to be implicit in whatever was said about the term in the *Rosenbloom* case itself is that the mere fact that a comment or publication concerns a pending judicial proceeding does not, without more, mean that it concerns "an event of public or general concern." There is nothing in the record before this court to indicate that the prosecution of the plaintiff's son was a part of a "police campaign" (see *Rosenbloom* v. *Metromedia, Inc., supra*, at 40). Nor is there an indication that it was anything other than a routine, isolated criminal prosecution of a drug charge up to the time the defendant published the erroneous statement that

the marshal had testified that other defendants in the proceeding had attributed the ownership of the drugs in question to the plaintiff. It may be argued that starting with the defendant's erroneous publication the criminal proceeding became "an event of public or general concern." It would indeed be a near subversion of the constitutional right of freedom of speech and of the press to hold that the defendant in this case acquired the benefit of the limitations applied in the *Rosenbloom* case because its otherwise libellous publication catapulted a relatively obscure criminal proceeding into an event or issue of public or general concern, and that therefore the plaintiff cannot prevail unless he proves malice on the part of the defendant. The court's decision in the present case holds that the defendant is entitled to a defence that applies only when a climate "of public or general concern" surrounds the subject matter of the alleged libellous publication. I would deny the defendant the right to that defence if its erroneous publication about the plaintiff created the climate essential to the applicability of the defence.

2. The opinion of Mr. Justice Brennan, writing for a plurality of the court in the *Rosenbloom* case, indicates clearly, in my opinion, that the rule stated therein, limiting the right of recovery in cases involving news media comment on "an event of public or general concern," applies only to actions brought by an individual who was involved in that issue, and not to a stranger thereto. Reference is made to a "person involved" or an "individual involved" in such an issue on pp. 42, 43, 44, 48, and 52 of the opinion. The clearest statement on the subject is the following, at 48: "The individual's interest in privacy — in preventing unwarranted intrusion upon the private aspects of his life — is not involved in this case, or even in the class of cases under consideration, *since, by hypothesis, the individual is involved in matters of public or general concern*" (emphasis supplied). In the *Rosenbloom* case, and also in the *Priestley* case decided by this court, the persons alleging libel were themselves directly involved in the matters which were held to be of "public or general concern." The

plaintiff in the present case was not involved in any way in the alleged criminal activity of his son or in the trial about which the defendant made the erroneous statement alleged to be libellous. He was an innocent bystander who was made the victim of some legally inexcusable fictionalizing by the defendant and one of its reporters. Furthermore, as I have discussed above, I do not believe that such trial was, without more, a matter of public or general concern. In my view, the rule stated by the line of cases represented by *New York Times Co.* v. *Sullivan*, 376 U. S. 254 (1964), and *Rosenbloom* v. *Metromedia, Inc.* 403 U. S. 29 (1971), does not apply to this case.[2]

·3. If my view is correct, we must then return to a consideration of the basic law of libel as heretofore applied to such cases in this Commonwealth. The following statement by Mr. Justice Stewart in his concurring opinion in *Rosenblatt* v. *Baer*, 383 U. S. 75 (1966), is appropriate thereto: "The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being — a concept at the root of any decent system of ordered liberty. The protection of private personality, like the protection of life itself, is left primarily to the individual States under the Ninth and Tenth Amendments. But this does not mean that the right is entitled to any less recognition by this Court as a basic of our constitutional system." 383 U. S. at 92. This general statement of principle is still applicable to defamatory statements by any of the news media about a matter which was not one "of public or general concern," or in which the person defamed was not involved.

It has long been the law of this Commonwealth that news media cannot be held liable for alleged defamatory statements contained in published reports of judicial proceed-

---

[2] But see *Davis* v. *National Bdcst. Co.* 320 F. Supp. 1070, 1072-1074 (E. D. La. 1970), affd. per curiam, 447 F. 2d 981 (5th Cir. 1971); *Alpine Constr. Co.* v. *Demaris*, 358 F. Supp. 422, 423 (N. D. Ill. 1973), which might lend support to an argument to the contrary.

ings, provided the reports are both fair and accurate. *Parker* v. *Republican Co.* 181 Mass. 392, 395-396 (1902). *Conner* v. *Standard Publishing Co.* 183 Mass. 474, 479 (1903). *Sweet* v. *Post Publishing Co.* 215 Mass. 450, 452-455 (1913). *Lundin* v. *Post Publishing Co.* 217 Mass. 213, 215-217 (1914). *Sanford* v. *Boston Herald-Traveler Corp.* 318 Mass. 156, 158-159 (1945). *Whitcomb* v. *Hearst Corp.* 329 Mass. 192, 199-200 (1952). *Joyce* v. *Globe Newspaper Co.* 355 Mass. 492, 498 (1969). *Lewis* v. *Vallis*, 356 Mass. 662, 666 (1970).

In *Whitcomb* v. *Hearst Corp.* 329 Mass. 193, 199 (1952), we held that "[a] publication which identifies a person who had nothing to do with the [judicial] proceedings as the one against whom the proceedings were directed can be neither fair nor accurate." A similar conclusion was reached in *Sweet* v. *Post Publishing Co.* 215 Mass. 450, 452-453 (1913), where the defendant erroneously identified the plaintiff as a person of a similar name who had been indicted by a grand jury.

I conclude that a person who is not involved in an event of public or general concern has the same right under the law of this Commonwealth to recover in libel for untrue and defamatory statements made about him in an unfair and inaccurate report of a judicial proceeding as he had before the United States Supreme Court handed down its series of decisions represented by *New York Times Co.* v. *Sullivan,* and *Rosenbloom* v. *Metromedia, Inc.*, both *supra.* See *Lewis* v. *Vallis*, 356 Mass. 662, 666-669 (1970), decided before the *Rosenbloom* case, in which this court found on the facts before it that the rule of the *New York Times* case and its progeny did not apply and proceeded to decide the case on the basis of the long-standing privilege for fair and accurate reporting of judicial proceedings.

The judge in this case instructed the jury in part that "the law as enunciated in the [*New York Times Co.* v. ] *Sullivan* case and subsequent decisions does not apply in this instant matter," that if "the defendant published the allegedly libelous statement and . . . the published statement was false and inaccurate, then the plaintiff has been

libeled by the defendant," and that if "the defendant published a statement which was not a fair and accurate report of the testimony which occurred in the District Court proceeding, the defendant is not entitled to any privilege and if the statement is untrue, the plaintiff has been libeled." He further instructed the jury on all other phases of the case, including that of damages. As to damages he expressly instructed the jury that the damages awarded, if any, were to be compensatory and not punitive. It is my opinion the instructions were adequate and correct, and I would so hold. It is my further opinion that such a result would in no way abridge the defendant's freedom of the press as guaranteed by the First Amendment of the United States Constitution. While the First Amendment may secure to the news media almost total protection from prior restraints, *New York Times Co.* v. *United States*, 403 U. S. 713 (1971), I do not believe it gives them the immunity which the defendant seeks on the facts of this case.

4. Since the court bases its decision on its conclusion that "the judicial proceeding which was reported was an event of public or general concern," it states (in fn. 3) that "we do not consider the effect of the fact that the plaintiff was a public officer." It is at least questionable whether the plaintiff was a public officer in the sense discussed in the *New York Times* and other Federal cases, but it is unnecessary to pursue that question for the purpose of this dissent.