W. HARVEY MERRILL *vs.* POST PUBLISHING COMPANY.

Essex.     November 6, 1907. — January 14, 1908.

Present: KNOWLTON, C. J., LORING, BRALEY, & RUGG, JJ.

*Libel and Slander.*

Allegations, contained in the declaration in an action of tort for libel, that the defendant falsely published in a newspaper that the plaintiff's sister and father had for ten years occupied one half of a house, the other half of which was occupied by the plaintiff's cousin, and that the two families had used the same halls, entrances and yard, but had not spoken to each other during that period, the same article stating that the plaintiff lived in another part of the city and that the cousin always spoke to him and " sympathized in his trouble," are not sufficient for the maintenance of the action.

A declaration in an action of tort for libel alleged that the defendant falsely published in a newspaper a certain article " of and concerning the plaintiff in conjunction with his sister also mentioned in said libellous publication." The article in a variety of ways stated that the sister had been arrested for stealing letters from the post-office. The defendant demurred. *Held,* that the alleged

statements might be a libel on both the plaintiff and his sister and well might be found to impair the standing of the plaintiff in the community although they did not affect his character, that therefore they were libellous as to him, and that the demurrer should be overruled.

A defendant in an action of tort for libel is liable for what is insinuated as well as for what is stated explicitly in the alleged libellous statement.

A declaration in an action of tort for libel alleged that the plaintiff was the postmaster of Salem, that the defendant, "contriving and maliciously designing to injure the plaintiff in his office as postmaster, and to disqualify him for and to imply misconduct by him in his office," published in a newspaper of wide circulation an article stating that the plaintiff's sister had been arrested "for stealing letters," that the plaintiff or his wife sold real estate at a sacrifice, that "some do not hesitate to call [the sister] a 'martyr,' a woman who placed herself in a compromising position in order that she might help others, (meaning the plaintiff)." The defendant demurred. *Held*, that it could not be said as a matter of law that "others" did not mean the plaintiff or that the count did not allege an insinuation that the plaintiff's difficulties were such that his sister stole in order that she might help him out of them, and that therefore the demurrer must be overruled.

A declaration in an action of tort for libel which alleged that the defendant published of the plaintiff, "he is now ill with disease" (meaning the infectious disorder) "and worn with care," does not set forth a statement of the defendant charging the plaintiff with having an infectious disease.

TORT for a libel alleged to have been printed concerning the plaintiff by the defendant in a newspaper called the Boston Sunday Post. Writ in the Superior Court for the county of Essex, dated September 2, 1904.

The material allegations of the first count of the declaration were that the plaintiff was the postmaster of Salem, and was "the person referred to in the herein alleged libel as postmaster, W. H. Merrill, and Harvey Merrill, and brother of Sophie Merrill"; that "the matter hereinafter charged to be libellous was published by said defendant of and concerning the plaintiff, in conjunction with his sister also mentioned in said libellous publication." The publication complained of was annexed to the first count and referred to therein as "Exhibit A." Its first sentences were: "Blood relatives and co-heirs, living together in the house jointly owned for over twenty years, and not having spoken to each other for over ten long years, is the strange story of Salem's divided house, of which Miss Sophie Merrill, now out on bail in connection with thefts from the Salem post-office, is a member.

"She and her father, William H. Merrill, occupying and owning half of the house 12 Liberty Street, and her cousin, John

Barker, occupying and owning the other half, have lived under the same roof, used the same entrances and the same yard, have passed each other in the entries of the house day in and day out, and have never exchanged even a syllable in all that long ten years."

Then followed an account of how the plaintiff's father and mother and sister Sophie came to own and occupy one half of the house, and John Barker and his mother came to own and occupy the other half, it being stated that they were all descendants of one Jonathan Merrill, and that, for a time after his death, the Barkers lived in New Hampshire, at which time " Harvey Merrill, the present postmaster, and his sister Sophie, now a recluse, under the cloud of shame and disgrace, often visited their boy cousins on the New Hampshire farm, and fruits and vegetables were often shipped by the Barker boys to their Salem cousins "; that, after the death of John Barker's father, he and his mother moved to Salem and occupied the other side of the house from that occupied by the father, mother and sister of the plaintiff, that, while Mrs. Merrill and Mrs. Barker lived, " everything was pleasant." " Both, however, died, and but a short time after the death of Mrs. Barker there began the ten years' silence that up to the present time has never been broken, not even at the time of the latest family trouble, the sensational arrest last winter of Miss Sophie Merrill, the postmaster's little old maid sister, for stealing letters." . . . " Neither of the Barker brothers ever spoke or had anything at all to do with Sophie Merrill or her father, but were and are, nevertheless, on good terms with Postmaster Harvey Merrill and all his family, who live in South Salem."

There then followed an account of events with regard to some property in East Boston, owned jointly, as was the Salem house, by the Merrills and the Barkers, " which, after the arrest of Miss Merrill, it was discovered had passed out of their [the Barkers'] hands unknowingly." " After the death of Mrs. Barker it is claimed that Miss Merrill collected the rents, and that the Barker brothers were given to understand, from time to time, that the house was untenanted, that they received but a trivial amount of money after their mother's death as their share of the income. After Miss Merrill's arrest — in anticipation of a need for money — her brother is said to have proposed to his cousins

selling the property in East Boston. They agreed, and then it was suddenly discovered that the house which they still supposed was theirs, had gone into other hands, having been sold for taxes, which they supposed had been paid all along. . . . The discovery of the passing of this property, and the subsequent discovery which it is claimed they made that the property had not been untenanted for many years, is further said to have added intensity to the feud of this divided house. Ever since Miss Merrill, to the great surprise of all who knew her, was arrested, charged with the theft of mail matter from the post-office, of which her brother is the official head, many sensational stories have been afloat. . . . Since the arrest, and her subsequent self-imposed imprisonment in her home, which she has never left since the day of her arrest, some of those who comprised the small circle of this reticent little woman's friends have deserted her in her hour of trouble and misfortune. The veil of mystery seems to surround the strange case of Sophie Merrill, who, on an income of $900 a year, was, it is alleged, forced to steal in order to live. It has been predicted, hundreds of times, that Sophie Merrill, the little maiden woman, with worn face and large sympathetic eyes, who dressed shabbily, rather than as if she earned a good salary, would never be tried. Such a thing would surprise no one and would relieve many; for, while there are always people to raise an argument on both sides, and while she herself is little known, Postmaster Merrill's friends are legion, and there is great sympathy for him, in view of what was to him a great and unexpected blow. After his sister's arrest he or his wife, to whom the property belonged, sold five houses in South Salem at a sacrifice, for the same reason, it is said, that he desired to turn the East Boston house into cash. For a long time after his sister's arrest Mr. Merrill called every day to see her, and, although John Barker, in passing in and out of his own half of the house, never spoke to the woman, whom he blames for the present curious condition of tenants who are living together as enemies, and have been for ten years, he always spoke to his cousin, the postmaster, in whose trouble he sympathized. At present this ' divided ' house is indeed a veritable house of trouble. Even Postmaster Merrill, a man with a sunny disposition and an unusual number of friends, has enemies. He has lost a fortune

in his lifetime, and is said to be heavily burdened with debt, besides which he is heavily weighed down by the crushing calamity that has fallen upon him.  As for his sister, there is a wide diversity of sentiment regarding her unfortunate situation.  Some look upon her as a woman who is mentally upset and thus did not realize what she was doing.  Some do not hesitate to call her a 'martyr,' a woman who placed herself in a compromising position in order that she might help.others, and there are always some who completely overlook the sentimental or the sympathetic side, and see only the naked facts. . . . How all this will end — the real story as to whether Sophie Merrill had or had not a clear and definite motive when she took the letters she did in the Salem post-office — is as much the mystery of Salem's queer 'divided' house as the origin of that strange feud which for years has existed, all unsuspected, under the roof tree of one of the city's most interesting houses."

The allegations in the second count were that the defendant published an article containing the statements set forth in the opinion, " contriving and maliciously designing to injure the plaintiff in his office as postmaster aforesaid and to disqualify him for and to imply misconduct by him in his office."

The third count alleged that the defendant caused to be published " a false and malicious libel concerning the plaintiff in the following words, to wit : ' her gray-haired brother' (meaning the plaintiff), the ' postmaster' (meaning the plaintiff), ' who ' (meaning the plaintiff) ' used to be noted for his happy genial smile, his debonair little air, but who ' (meaning the plaintiff) ' is now ill with disease ' (meaning the infectious disorder and meaning the plaintiff) ' and worn with care ' (meaning the plaintiff).

The defendant demurred to the declaration and the demurrer was sustained by *Fox*, J.  Judgment was entered for the defendant, and the plaintiff appealed.

*H. Dunham*, for the plaintiff.

*J. T. Pugh*, for the defendant.

LORING, J.  It is alleged in the first count, which by reference sets forth at length the whole article published in the defendant's newspaper, that this article was published " of and concerning the plaintiff, in conjunction with his sister also mentioned in said libellous publication."

We are of opinion that as matter of law there is nothing in what is there written as to the mystery of the divided house, No. 12 Liberty Street, Salem, which is a libel on the plaintiff. It is not stated that the plaintiff lived at that house during the time in question. It was Sophie and her father and John Barker and his mother who originally lived in the two halves of that house, and the period of ten years' silence between the two families began about 1894, when John Barker's mother died. During this time the plaintiff lived " in South Salem," and it is stated that after Sophie's arrest John Barker " always spoke to his cousin, the postmaster, in whose trouble he sympathized."

If the first count sets forth a libel on the plaintiff, it is in substance because, in a variety of ways, the article in question states " of and concerning the plaintiff," that his sister Sophie has been arrested for larceny of letters from the post-office.

The defendant's argument is that this is a libel on Sophie and not on the plaintiff.

This is undoubtedly a libel on Sophie, but it does not necessarily follow that it is not a libel on the plaintiff also. See *Dow* v. *Long*, 190 Mass. 138.

To write of a man that he is the brother of a sister arrested for larceny might well be thought by a jury " to impair his . . . standing in the community," to use the language employed by this court in *Bishop* v. *Journal Newspaper Co.* 168 Mass. 327, 331, 332.

In almost every case of libel the reputation of the plaintiff as to character is attacked. The case at bar presents the question whether there are not statements which affect a person's standing in the community which do not affect his character. And we are of opinion that there are. It was so decided in *Shelby* v. *Sun Printing & Publishing Association*, 109 N. Y. 611, affirming " on opinion below " the decision of the Supreme Court, reported in 38 Hun, 474. The libel in that case consisted in stating that the plaintiff and his sister " are illegitimate children of the adopted father's intimate friend." In the court below it was stated that: " In this case there was no charge against the integrity or morality, or behavior or reputation, of the plaintiff. The statement is that she is illegitimate, a circumstance over which, of course, she could have no control, and for which she was personally in no

way whatever responsible. In the estimation of mankind, however, as it is understood, the assertion that a person is illegitimate is a reproach, and one which might, in all probability, frequently subject the person of whom it is said to contumely, to indignity, and, perhaps, to insult. It is unfortunate to be obliged to take this view of human conduct, but we must take the world as we find it, and reason out the problems which are presented to us with reference to human frailties or human prejudices, whatever may be the designation given to a disposition often exhibited to make a person suffer for the deeds of his ancestors." And in support of that conclusion Starkie on Slander & Libel, (Am. ed. of 1830) 166, and the cases of *Cropp* v. *Tilney*, 3 Salk. 226, and *Villers* v. *Monsley*, 2 Wils. 403, were there cited. See also in this connection Wythens, J., in *Baldwin* v. *Flower*, 3 Mod. 120 ; Odgers, Libel & Slander, (4th ed.) 16.

The statement that the plaintiff is a bastard is not the only statement which affects his standing in the community. We cannot doubt that it would be a libel to publish of a white man that he is a negro. A negro may be far more noble in character than the white plaintiff; but that is not the question. If a plaintiff is stated in writing to be a negro when he is in fact a white man, his standing in the community is or may be affected.

In our opinion the same is true of a written statement that the plaintiff's father and mother and other ancestors were criminals, and in a less degree, as in the case at bar, that a brother or sister is a criminal or has been arrested for crime.

The defendant has cited the case of *Subbaiyar* v. *Kristmaiyar*, Ind. L. R. 1 Madr. 383, as a decision to the contrary. That was a case where a brother brought an action because the defendant had uttered a defamatory statement as to his sister. The defamatory statement in that case was made of the sister and not of the plaintiff, and the plaintiff's name was not mentioned in connection with the statement in question. All that was decided in that case was that, to be the foundation of an action, the defamatory words complained of must have been spoken of the plaintiff. The decision was plainly right. To write of a woman that she has had an illegitimate daughter (who is not named) is a libel on the woman. But it is not a libel on the

woman's illegitimate daughter, and, although it may hurt the daughter, she cannot sue the defendant because he has not published a libel of and concerning her. See in this connection the reasoning of Cranch, C. J., in *Johnson* v. *Brown,* 4 Cranch C. C. 235, 237. On the other hand, to write of the daughter that she is an illegitimate child, without naming the mother, is a libel on the daughter, as was held in *Shelby* v. *Sun Printing & Publishing Association,* 109 N. Y. 611, but it is not a libel on the mother. And although the mother may suffer she cannot sue, for the reason that the defamatory words were not written of her. The cases of *Luckumsey Rowji* v. *Hurbun Nursey,* Ind. L. R. 5 Bomb. 580, and *Sorensen* v. *Balaran,* 11 App. Div. (N. Y.) 164, are cases where the defamatory words were spoken of a deceased person, and they are decisions standing on the same footing as *Subbaiyar* v. *Kristmaiyar, ubi supra,* namely, that the defamatory words were spoken of the deceased person alone and were not spoken of the plaintiff.

The case at bar is a case where the defamatory words are alleged to have been published " of and concerning the plaintiff, in conjunction with his sister also mentioned in said libellous publication." It remains to consider whether that is legally possible ; whether, for example, a written statement that a woman (naming her) has had an illegitimate daughter (naming her) is or may be a libel on both. We are of opinion that it may be, although the case of *Wellman* v. *Sun Printing & Publishing Association,* 66 Hun, 331, seems to be a decision to the contrary.

We are of opinion that we cannot withdraw the case stated in the first count from the jury. To do so we must be able to say that with respect to the plaintiff the publication is not reasonably capable of being understood in a defamatory sense. See *Twombly* v. *Monroe,* 136 Mass. 464, 469.

The second count does not purport to incorporate or to refer to Exhibit A annexed to the first count, and must stand on the allegations therein contained alone. *Farquhar* v. *Farquhar,* 194 Mass. 400. *Massachusetts Ins. Co.* v. *Green,* 185 Mass. 306, 310. This count contains many of the statements found in Exhibit A without the context there set forth. Some of them are unintelligible without the context. With the exception of one innuendo which we shall refer to later on, the others do not state a case

unless one is stated in the first count.  The allegation that these statements were made " of and concerning the plaintiff in his office of postmaster " does not add to the allegations of the first count.  In an action for slander words not actionable *per se*, if spoken in connection with the plaintiff's profession and business and followed by special damage, are actionable.  See for example *Morasse* v. *Brochu*, 151 Mass. 567.  But the words here complained of were printed, and this is an action for libel, not slander.

Two statements are unintelligible, one because there is no end to the sentence, the other because there is no beginning.

The words " now a recluse," plainly refer to the sister only.

In this count it is alleged that the newspaper article complained of, after stating that the plaintiff's sister had been arrested " for stealing letters," and that the plaintiff " or his (meaning the plaintiff's) wife, to whom the property belonged, sold five houses in South Salem at a sacrifice, for the same reason, it is said, that he (meaning the plaintiff) desired to turn the East Boston house into cash," continued : " 'As for his ' (meaning the plaintiff's) 'sister, there is a wide diversity of sentiment regarding her unfortunate situation.  Some look upon her as a woman who is mentally upset, and thus did not realize what she was doing.  Some do not hesitate to call her a " martyr," a woman who placed herself in a compromising position in order that she might help others,' meaning the plaintiff."  We cannot say that the jury could not find that " others " meant the plaintiff, and that this count does not allege by insinuation that the plaintiff's difficulties were such that his sister stole that she might help him out of them.  A defendant is liable for what is insinuated as well as for what is stated explicitly.  *Twombly* v. *Monroe*, 136 Mass. 464.  *Haynes* v. *Clinton Printing Co.* 169 Mass. 512.  To write of a man that he was in such difficulties that his sister stole to help him out of them might be thought by the jury to be libellous.  See in this connection *Martin* v. *Press Publishing Co.* 93 App. Div. (N. Y.) 531.

As to the third count, the article complained of did not charge the plaintiff with having an infectious disease.

At the argument the plaintiff waived his appeal from the

judgment of the Superior Court in favor of the defendant on the fourth count.

It follows that the entry must be

*Judgment for the defendant on the third and fourth counts · affirmed; judgment for the defendant on the first and second counts reversed.*