Mary Claire BALL, Thomas
Ames Ball, Plaintiffs,

v.

WAL–MART, INC., Defendant.

No. Civ.A. 98–11887–RBC.[1]

United States District Court,
D. Massachusetts.

June 23, 2000.

---

**1.** With the parties' consent, this case has been referred and reassigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c).

Janice O. Fahey, Craig & Macauley, P.C., Boston, MA, for defendants.

William J. Ruotolo, McKay & Ruotolo, Warwick, RI, for plaintiffs.

## MEMORANDUM AND ORDER ON DE-FENDANT'S MOTION FOR SUM-MARY JUDGMENT (# 46)

COLLINGS, Chief United States Magistrate Judge.

### I. Introduction

Wal–Mart prides itself on its policy of having "people greeters" with smiling faces who stand at the entrances to their stores presumably to "greet" shoppers.[2] At times, Wal–Mart assigns the "greeters" to do other tasks. Mary Claire Ball (hereinafter, "Ms.Ball") had an encounter with one of the "greeters" on November 22, 1997 which did not leave her smiling. In fact, it led to the filing of this lawsuit ten months later.

Ms. Ball's central allegation in this lawsuit is that one of these "greeters," a Wal–Mart employee, one James Harris ("Mr.Harris"), denied her egress from a Wal–Mart store and proceeded to search her shopping cart before letting her leave. The shopping cart contained all of the items processed and purchased through the check-out counter.

Ms. Ball and her husband, Thomas Ames Ball ("Mr.Ball") filed the eight-count complaint in this case on August 13, 1998 in the Superior Court for Norfolk County, Massachusetts, naming as party defendant Wal–Mart, Inc. ("Wal–Mart"). On Sep-tember 3, 1998, Wal–Mart filed an answer and eleven days thereafter, the action was removed to the federal court.

The litigation has progressed to the point where discovery has closed and the defendant has filed a motion for summary judgment including a concise statement of material facts (# 46), a memorandum of law in support, and an appendix of exhibits (# 47). In response, Ms. Ball and Mr. Ball have submitted an opposition to Wal–Mart's dispositive motion (# 48). The defendant has also submitted a supplemental memorandum in support of its motion for summary judgment (# 52). With the record now complete, the defendant's motion for summary judgment is in a posture for decision.

### II. The Facts

The facts that are fundamental to the relevant events in this case are largely uncontroverted. However, the inferences, implications, and conclusions to be drawn from those facts most certainly are.[3] If any relevant facts are in dispute, it shall be noted although, of course, the facts are to be viewed in the light most favorable to the non-moving party.

In anticipation of the Christmas holiday season the defendant, Wal–Mart, store number 2103, had a receipt/bag checking policy in place to discourage shoplifting. (Concise Statement of Material Facts, # 46 ¶ 1; Affidavit of Kallie Spaulding, # 47 Exh. A, ¶ 3) This policy provided that Wal–Mart employees stationed near the exits would check the shopping bags against the patrons' receipt as they left the store. (# 46 ¶ 2; # 47 Exh. A, ¶ 4) The bag check was to take place inside the store and within view of the checkout counters. (# 46 ¶ 5; # 47 Exh. A, ¶ 7) If the store was busy employees were instructed to

---

**2.** Recent TV ads indicate that some of these "people greeters" welcome shoppers with hugs.

**3.** Both parties have included statements in the record that are objectionable on evidentiary grounds and would not otherwise be ad-missible at trial. As mandated by Rule 56, only admissible evidence proffered by the parties shall be relied upon in deciding the motion for summary judgment. *See* Fed.R.Civ.P. 56(e).

check as many bags as they could. (# 46 ¶ 3; # 47 Exh. A, ¶ 5) If a customer refused to have his or her bag checked, the policy allowed the person to pass. (# 46 ¶ 6; # 47 Exh. A, ¶ 8) There is no evidence that any notice of said policy was given to shoppers either as they entered the store or as they paid for their purchases and left the store through the exits.

On November 22, 1997, Ms. Ball and her husband went shopping at Wal–Mart store number 2103, located in Walpole, Massachusetts.[4] (Ms. Ball's deposition, # 48 Exh. 1 at 20) After making her selections, Ms. Ball brought her items to the cash register where she purchased them with a personal check. (# 48 Exh. 1 at 27) Small items were placed in a blue bag provided by the defendant, and all items were placed in the shopping cart. (# 47 Exh. C, at 1)

As Ms. Ball walked into the foyer marked "Exit," Mr. Harris approached her. (# 48, Exh. 4 at ¶ 5) Ms. Ball gives somewhat conflicting statements as to what was said and not said during the encounter. In her answers to interrogatories (# 47, Exh. C at p. 2) signed on September 22, 1998, she stated:

I walked to the door of the foyer and noticed an elderly gentleman adjusting the door. As I approached the door and stepped into the foyer, he suddenly remarked, "Well, what do we have here?" . . . I was unable to to continue toward the second door because the gentleman leaned over my wagon and stated "The cameras are not working." As he continued to examine my previously paid for items, he asked to see my receipt.

At her deposition signed on October 13, 1999, she testified:

I paid with a check and I walked toward the door and I noticed a gentleman, an older gentleman, standing by the frame of the door. And as I approached him, just after I entered the foyer, as soon as

I pushed my carriage into the foyer, he said, "Well, what do we have here"?

In an affidavit filed on January 15, 2000 (# 48, Exh. 4, ¶¶ 5–9), she stated:

As I entered the foyer marked as the "Exit," an elderly man approached me without saying a word and placed his body up against my cart preventing me from leaving the store. The elderly man leaned over my cart and looked inside the blue Wal–MART bag at the items I purchased. He did this for quite a long time.

\* \* \* \* \* \*

After perusing the items in my shopping bag and shopping cart, the elderly man looked at me with eyes squinting and said "Could I have your receipt." [sic] His words were stated in such a manner that clearly reflected that it was imperative to give him my receipt. His words were not a mere precatory and polite request. His eyes made me believe that he was looking into my face in order to memorize my appearance.

\* \* \* \* \* \*

After the elderly man was finished searching the items in my shopping, the elderly man asked for no receipts from the many persons who had lined up behind me while he searched my personal property.

After perusing the articles in the shopping cart, Mr. Harris returned the receipt to the plaintiff. (# 47 Exh. C, at 2) By Ms. Ball's estimation, the incident lasted several minutes. (# 47 Exh. C, at 2) A woman directly behind the plaintiff remarked, "He's holding up the whole line. ·What did he think, you had done-stolen [sic] something?" (# 47 Exh. C, at 2)

After the incident, Ms. Ball walked to her car and requested her husband to accompany her back inside the defendant's store in order to lodge a complaint about the incident. (# 47 Exh. C, at 2) The Balls first complained to a Wal–Mart cashier

4. Actually, Mr. Ball waited in the car while his wife went into the store.

about the policy. To this, the employee replied, "Oh yes, we're doing that now." (# 47 Exh. C, at 2) The plaintiffs were then directed to another employee, Shawn Suhoski, who acknowledged the policy and also identified Mr. Harris as the employee who conducted the inspection. (# 47 Exh. C, at 3) When the Balls arrived home they called Wal–Mart headquarters in Bentonville, Arkansas in order to complain about the receipt/bag check policy. (# 47 Exh. C, at 3) Several days later the plaintiffs received a telephone call from Kallie Spaulding, the manager of the Wal–Mart store in Walpole, Massachusetts. (# 47 Exh. C, at 3) Ms. Spaulding expressed her regrets, but explained that checking the customers' bags and receipt was company policy.[5] (# 47 Exh. C, at 3)

This factual recitation sufficiently sets the stage for the present action. Further facts shall be added, as necessary, during the legal discussion.

### III. The Claims

All claims arise under state law.[6] The first six counts of the plaintiffs' complaint relate to Ms. Ball. Count I alleges a claim for defamation. A claim for invasion of privacy is asserted in Count II. Counts III and IV set forth causes of action for negligent and intentional infliction of emotional distress respectively. Count V charges a violation of Mass.Gen.Laws. ch. 93A. Count VI advances a charge of negligent hiring. Thomas Ball claims a loss of consortium in Count VII. Finally, Ms. Ball alleges a claim of false imprisonment in Count VIII.

### IV. The Summary Judgment Standard

When considering whether to grant summary judgment, the Court must determine whether:

... the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is a genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

In making this assessment, the Court must "accept all reasonable inferences favorable to the nonmovant." *Int'l Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Ctr.*, 103 F.3d 196, 205 (1 Cir., 1996); *see also Lawton v. State Mut. Life Assurance Co. of America*, 101 F.3d 218, 222–23 (1 Cir., 1996); *Borschow Hospital and Medical Supplies v. Cesar Castillo, Inc.*, 96 F.3d 10, 12 (1 Cir.1996); *Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 253 (1 Cir., 1996); *One Nat'l Bank v. Antonellis*, 80 F.3d 606, 608 (1 Cir., 1996).

A factual dispute which is neither "genuine" nor "material" will not survive a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding whether a factual dispute is "genuine", the Court must determine whether the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.; see also Serrano–Cruz v. DFI Puerto Rico, Inc.*, 109 F.3d 23, 25 (1 Cir., 1997); *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1 Cir.1996); *Roche*, 81 F.3d at 253. In weighing whether a factual dispute is "material", the Court must examine the substantive law of the case, because "only disputes over the facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Vinick v. Commissioner of Internal Revenue*, 110 F.3d 168, 171 (1 Cir., 1997); *Sanchez*, 101 F.3d at 227; *Roche*, 81 F.3d at 253. "Thus

---

5. Ms. Spaulding also asserts that it is not only company policy, but it is standard industry practice for busy stores during the holiday season to perform bag and receipt checks. (2nd Affidavit of Kallie Spaulding # 49 Exh. D, ¶ 4)

6. Jurisdiction in this case is based upon diversity of citizenship between the parties.

the substantive law defines which facts are material." *Sanchez*, 101 F.3d at 227 (citing *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505).

Rule 56 does not permit the party opposed to the summary judgment motion to rest upon the mere allegations or denials in its own pleadings. *See Int'l Ass'n of Machinists and Aerospace Workers*, 103 F.3d at 205 (quoting *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794 (1 Cir., 1992), *cert. denied*, 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993) ("The core purpose of the summary judgment procedure is to 'pierce the boilerplate of the pleadings' and evaluate the proof to determine whether a trial will serve any useful purpose."). Rather, Rule 56(c):

> mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### V. *Discussion*

#### A. Defamation (Count 1)

▇ In Count I Ms. Ball asserts a claim for defamation. Under Massachusetts law, an actionable case of defamation is made out when "a published communication about an individual . . . ridicules or treats the plaintiff with contempt." *Correllas v. Viveiros*, 410 Mass. 314, 319, 572 N.E.2d 7,10 (1991) (citing *Merrill v. Post Pub. Co.*, 197 Mass. 185, 191–192, 83 N.E. 419, 422 (1908)); *see also Arsenault v. Allegheny Airlines*, 485 F.Supp. 1373, 1378 (D.Mass., 1980). A plaintiff must also prove that she has been discredited in a "considerable and respectable class of the community." *Smith v. Suburban Restaurants, Inc.*, 374 Mass. 528, 529–531, 373 N.E.2d 215, 217–218 (1978); *Muchnick v. Post Pub. Co.*, 332 Mass. 304, 306, 125 N.E.2d 137, 139 (1955); *Peck v. Wakefield Item Co.*, 280 Mass. 451, 454, 183 N.E. 70, 71 (1932).

▇ In actions for defamation, the initial issue is whether a statement is reasonably susceptible of defamatory meaning. *Foley v. Lowell Sun Publishing Co.*, 404 Mass. 9, 11, 533 N.E.2d 196, 197 (1989). Whether a particular communication is defamatory is a question of law for the courts. *Flotech, Inc. v. E.I. Du Pont de Nemours Co.* 627 F.Supp. 358, 367 (D.Mass., 1985). If a threshold determination is made that a statement is not defamatory as a matter of law, summary judgement is proper. *Foley*, 404 Mass. at 10 n. 4, 533 N.E.2d at 197 n. 4 (1989).

▇ The facts taken in the light most favorable to Ms. Ball show that just before Mr. Harris checked Ms. Ball's purchases he said, "Well, what do we have here?" "Could I have your receipt?" and "The cameras are not working." The plaintiffs allege that these statements are defamatory because they impute the crime of larceny onto Ms. Ball. It is well-established in Massachusetts that words imputing a crime are defamatory *per se*. *Sousa v. Davenport*, 3 Mass.App.Ct. 715, 715, 323 N.E.2d 910, 911 (1975); *Stone v. Essex County Newspapers*, 365 Mass. 246, 250, 311 N.E.2d 52, 55 (1974); *Lynch v. Lyons*, 303 Mass. 116, 118–119, 20 N.E.2d 953, 954–955 (1939); *Brown v. Nickerson*, 71 Mass. 1, 5 Gray 1 (1855); *Miller v. Parish*, 25 Mass. 384, 8 Pick. 384 (1829). Did James Harris impute the crime of larceny onto Ms. Ball? At no point did Mr. Harris openly accuse Ms. Ball of shoplifting. Neither was her veracity questioned nor was she ever threatened with prosecution. Understood in its natural sense, Mr. Harris' speech alone cannot be seen as imputing crime. *Peck*, 280 Mass. at 453, 183 N.E. at 71 (1932) (allegedly defamatory words should be understood in their natural sense). In short, there is no facial imputation of crime in the words of James Harris and the plaintiffs present no facts or case law that would indicate otherwise.

 Nevertheless, communication can be defamatory through its contextual meaning.[7] That is to say, a communication that is facially non-defamatory can become actionable by reason of the peculiar situation. *See Flotech*, 627 F.Supp. at 369 (D.Mass., 1985). In the present case, the contextual backdrop for Mr. Harris' speech, taken in the light most favorable to Ms. Ball, is such that a reasonable juror might find that Mr. Harris was imputing a criminal act to her.

First, there is no evidence that Wal–Mart's policy of checking shoppers' bags when they left to store was made known to the shoppers. Thus, neither Ms. Ball nor any other shopper would have known that Mr. Harris was merely stopping Ms. Ball as part of a routine practice of checking contents of shoppers' bags against receipts. In fact, on Ms. Ball's testimony, no other shoppers' parcels were inspected, at least none of the group of people who were waiting behind Ms. Ball to leave the store and who observed her encounter with Mr. Harris.

Second, the initial statement "Well what have we here?" together with the statement that the cameras were not working could, in the circumstances, very well lead a reasonable person observing the event to have concluded that Mr. Harris was acting because he suspected Ms. Ball of shoplifting. This is buttressed by the comment to Ms. Ball by another person waiting to leave the store to the effect that, "What did he think, you stole something?"

For these reasons, I find that the plaintiff has presented sufficient facts and admissible evidence to show a defamatory context for Mr. Harris' speech. Consequently, the defendant's motion for summary judgment will be denied as to Count I.

### B. Invasion of Privacy (Count II)

Ms. Ball's privacy is alleged to have been invaded by detaining her against her will and inspecting her purchased items, in violation of G.L. c. 214, § 1B. The Massachusetts Privacy Act provides in full:

> A person shall have the right against unreasonable, substantial or serious interference with his privacy. The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages.

M.G.L. c. 214, § 1B.

 In order to be actionable, the interference must be unreasonable *and* either substantial or serious.[8] *Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 409 Mass. 514, 518–520, 567 N.E.2d 912 (1991) (emphasis added). If the defendant's action is not found to be "substantial" or "serious," relief is precluded under G.L. c. 214, § 1B. *Schlesinger*, 409 Mass. at 521, 567 N.E.2d at 916. If a plaintiff fails to make out this threshold element, it is unnecessary to decide the further issue of whether the defendant's actions were "unreasonable." *Id.*

It has been held in Massachusetts that a person may relinquish a privacy right by placing themselves in a context where their legitimate expectation of privacy is reduced. *Schlesinger*, 409 Mass. at 521, 567 N.E.2d at 915–916; *see also Broderick v. Police Comm'r of Boston*, 368 Mass. 33,

---

7. The distinction between *per se* and *per quod* defamation has been abolished. *See Sharratt v. Housing Innovations, Inc.*, 365 Mass. 141, 147, 310 N.E.2d 343, 347 (1974). Consequently, the context in which a seemingly harmless comment is made is always to be considered. *Colby Haberdashers v. Bradstreet Co.*, 267 Mass. 166, 170, 166 N.E. 550, 551 (1929).

8. "The fact that the adjectives in [G.L. c. 214, § 1B] are in the disjunctive rather than cumulative naturally leads one to suppose that if the interference satisfies any one of them it will be actionable. However, if one gives those adjectives a natural interpretation, this turns out not to be the case, as shown." *Schlesinger*, 409 Mass. 514 n. 5, 567 N.E.2d 912, 914 n. 5 (internal quotations are from, *The Massachusetts Right of Privacy Statute: Decoy or Ugly Duckling?*, 9 Suffolk U.L.Rev. 1248, 1267 n. 93 (1975).

44, 330 N.E.2d 199, 206 (1975) (a right of privacy may be surrendered by public display). Common sense tells us that the act of shopping in a store involves exposure of the person and the items they purchase.

The notion of a right of privacy is founded on the idea that individuals may hold close certain manuscripts, private letters, family photographs, or private conduct which is no business of the public and the publicizing of which is therefore offensive. The appearance of a person in a public space necessarily involves doffing the cloak of privacy which the law protects. *Cefalu v. Globe Newspaper Co.*, 8 Mass.App.Ct. 71, 77, 391 N.E.2d 935, 939 (1979) (holding, on motion for summary judgment, that a photograph taken of the plaintiff in an unemployment line was not an invasion of privacy).

■ The facts in the instant case show that the receipt/bag check was limited to what could be observed in the shopping cart and the WAL–MART bag which had just been purchased by Ms. Ball. All of these items had just seconds before been on full display at the checkout counter.

"The law does not provide a remedy for every annoyance that occurs in daily life. Many things which are distressing or may be lacking in propriety or good taste are not actionable." *Kelley v. Post Publishing Co.*, 327 Mass. 275, 278, 98 N.E.2d 286, 287 (1951). The court, when analyzing causes of action stated under G.L. c. 214, § 1B, is bound by "prevailing societal values and the ability to enter orders which are practical and capable of reasonable enforcement." *Schlesinger*, 409 Mass. at 519, 567 N.E.2d at 915. In keeping with this spirit and in all the circumstances, Ms. Ball has failed to show that inspecting what she had just purchased was either a substantial or serious intrusion on her right to privacy. As a matter of law, the claim must fail. Wal–Mart is entitled to the entry of summary judgment on Count II.

## C. Negligent Infliction of Emotional Distress (Count III)

■ Next it is alleged in Count III that Wal–Mart negligently inflicted emotional distress on Ms. Ball. To establish this tort, a plaintiff must prove:

(1) negligence, (2) emotional distress, (3) causation, (4) physical harm manifested by objective symptomology, and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case.

*Payton v. Abbott*, 386 Mass. 540, 557, 437 N.E.2d 171, 181 (1982).

■ First, the plaintiff has not only proffered no evidence of negligence, she also has not even specified what acts or inactions of the defendant are alleged to have been negligent. This is not surprising since her complaint is directed at the defendant's intentional acts, such as false imprisonment.

Second, the plaintiff has proffered insufficient evidence of "physical harm manifested by objective symptomology", *Payton*, 386 Mass. at 557, 437 N.E.2d at 181, and of any causal link between the physical harm and the incident at Wal–Mart. A claim for negligent infliction of emotional distress must do more than allege "mere upset, dismay, humiliation, grief and anger." *Sullivan v. Boston Gas Company*, 414 Mass. 129, 137, 605 N.E.2d 805, 809–810 (1993). In order to show physical harm as evidenced by objective symptomology, expert medical testimony may be required. *Sullivan*, 414 Mass. at 138, 605 N.E.2d at 811. On a motion for summary judgment, plaintiffs must support their mental distress claims,

with enough objective evidence of harm to convince a judge that their claims present a sufficient likelihood of genuineness to go to trial. [ . . . ] The judge, then, will need to consider each case in its particular factual context.

*Sullivan*, 414 Mass. at 137–138, 605 N.E.2d at 810.

In the present case, Ms. Ball claims the incident with Mr. Harris has adversely affected her sleep and caused her to lose weight. While the plaintiff's maladies may rise to the level of "physical harm", no objective, corroborative evidence linking her symptoms with Wal–Mart's actions has been proffered.

In *Sullivan,* the court found that the plaintiffs, who witnessed their homes explode due to a gas leak, presented sufficient evidence of a physical manifestation of mental distress (i.e., sworn affidavits from experts who linked their symptoms of post traumatic stress disorder to the explosion) to survive a summary judgment motion. In determining whether a plaintiff has established facts which support a claim for emotional distress,

> the judge will use his or her discretion to evaluate the evidence keeping in mind that the overall goal is to determine whether the evidence sufficiently corroborates the plaintiff's claims of mental distress and to strike a wise balance between the fear of fraudulent claims and the danger that worthy claims will not be heard.

*Sullivan,* 414 Mass. at 138, 605 N.E.2d at 810 (1993).

The absence of corroborating medical evidence leaves a plaintiff's cause of action vulnerable to disposition by summary judgment. *Sullivan,* 414 Mass. at 139, 605 N.E.2d at 810. In other instances, a plaintiff who has provided the court with expert medical testimony may still not survive a motion for summary judgment. In *Flanagan v. Baker,* 35 Mass.App.Ct. 444, 450, 621 N.E.2d 1190, 1194 (1993), *rev. denied,* 416 Mass. 1109, 630 N.E.2d 603 (1993), the court held that a clinical psychologist's statement, "I believe that [the plaintiffs] sustained physical harm manifested by objective symptomology" was insufficient to withstand the defendant's motion for summary judgment.[9]

It is noted that a lack of expert medical testimony will not, in itself, defeat the plaintiff's cause of action. "[A]bsence of medical evidence could make it more difficult, but not impossible, for a plaintiff to meet his burden of producing 'sufficient objective evidence of physical manifestation of mental distress to survive a motion for summary judgment.'" *Bresnahan v. McAuliffe,* 47 Mass.App.Ct. 278, 285, 712 N.E.2d 1173, 1178 (1999) (quoting *Sullivan,* 414 Mass. at 139, 605 N.E.2d at 811). The court held in *Bresnahan* that affidavits of the nurses who observed the plaintiffs for ten months provided sufficient objective evidence to survive summary judgment.

The problem in the instant case is that there is no medical evidence that Ms. Ball's complaints of weight loss and insomnia are in any way linked with the complained-of incident other than that the symptoms began to occur after the incident at Wal–Mart. This is insufficient. This is especially true since Ms. Ball was being treated for depression *before* the incident at Wal–Mart.[10] The insomnia and weight loss could have been due to the depression. To succeed on her claim, Ms. Ball must produce objective evidence, probably by an medical expert, that would tend to corroborate or link her symptoms of insomnia and weight loss to the incident at Wal–Mart. In the circumstances of this case, Ms. Ball's mere assertion that these problems occurred after the incident at Wal–Mart is plainly insufficient. Defendant's motion for summary judgment shall be granted as to Count III.

### D. Intentional Infliction of Emotional Distress (Count IV)

Turning next to the intentional infliction of emotional distress claim, the

---

9. *See also, Odell v. Wilder,* 1995 WL 809992, *2 (Mass.Super.) 4 Mass.L.Rptr. 90. (an informal, unsworn letter from the plaintiff's doctor, without more, cannot defeat a motion for summary judgment).

10. According to medical records submitted by plaintiff (# 39), Ms. Ball was diagnosed with depression on October 2, 1997 and prescribed serzone.

plaintiffs allege that Wal–Mart intentionally inflicted emotional distress on Ms. Ball by accusing her of larceny. To make a case for intentional infliction of emotional distress it is necessary,

> "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct, (2) that the conduct was 'extreme and outrageous,' was 'beyond all possible bounds of decency' and was 'utterly intolerable in a civilized community,' and (3) that the emotional distress sustained by the plaintiff was 'severe' and of a nature 'that no reasonable man could be expected to endure.'" [11]

*Agis v. Howard Johnson Co.*, 371 Mass. 140, 144–145, 355 N.E.2d 315, 318–319 (1976).

These requirements are "aimed at limiting frivolous suits and avoiding litigation in situations where only bad manners and mere hurt feelings are involved." *Agis*, 371 Mass. at 145, 355 N.E.2d at 319. In a case alleging intentional infliction of emotional distress a two-prong test must be applied. First, the judge must determine whether the conduct may reasonably be viewed as extreme and outrageous. Second, the jury must determine whether the conduct was, in fact, extreme or dangerous. *Boyle v. Wenk*, 378 Mass. 592, 598 n. 11, 392 N.E.2d 1053, 1057 n. 11 (1979) (citation omitted). If the first prong is decided in the defendant's favor there is no need to reach the second. *See Redgrave v. Boston Symphony Orchestra, Inc.*, 557 F.Supp. 230, 236 (D.Mass., 1983) (holding, *inter alia*, that the Boston Symphony Orchestra's conduct in canceling celebrity's contract did not rise to the level sufficient to survive a motion to dismiss).

The term "outrageous" has been defined in Massachusetts to mean "more than workaday insults, annoyances, or even threats and petty oppressions. It means, for example a high order of reckless ruthlessness or deliberate malevolence[.]" *Conway v. Smerling*, 37 Mass.App.Ct. 1, 8, 635 N.E.2d 268, 273 (1994). When determining whether the plaintiff has made out a claim, the court is entitled to put as harsh a face on the defendant's actions as the facts will reasonably allow. *Foley v. Polaroid*, 400 Mass. 82, 100, 508 N.E.2d 72, 82 (1987) (citation omitted).

█ It is undisputed that Mr. Harris asked to see Ms. Ball's receipt. While checking her purchases he said, "Well, what do we have here?" and "The cameras aren't working." Even assuming, *arguendo*, that despite Wal–Mart's policy of stopping as many exiting customers as possible, Mr. Harris stopped Ms. Ball because he felt she was shoplifting, the plaintiff still cannot make out a case for intentional infliction of emotional distress. It is not enough that the defendant acts with an intent that is tortious or even criminal, or that he has intended to inflict emotional distress. *Foley*, 400 Mass. at 99, 508 N.E.2d at 82. The conduct itself must be so outrageous in character as to be regarded as "atrocious, and utterly intolerable in a civilized society." *Id.* Mr. Harris' conduct, viewed as harshly as the facts will reasonably allow, does not begin to approach this level.

In response to the defendant's motion for summary judgment, the plaintiff has not produced any countervailing evidence that would raise a genuine issue of material fact with respect whether Mr. Harris' conduct could be viewed as "extreme or outrageous." It is incumbent upon Ms. Ball to provide the court with some indication that she can produce the requisite quantum of evidence to enable her to reach a jury with her claim. *A. John Cohen Ins. Agency, Inc. v. Middlesex Ins. Co.*, 8 Mass. App.Ct. 178 183, 392 N.E.2d 862, 865

---

**11.** The internal quotations are from Restatement (Second) of Torts § 46, comments d and

j.

(1979). Summary judgment shall enter for the defendant on Count IV.

### E. Chapter 93A (Count V)

■ Turning now to Count V, Wal–Mart is said to have violated Chapter 93A of the Massachusetts General Laws by dealing with Ms. Ball in an unreasonable, unfair, and deceptive fashion. The substantive merits of the plaintiff's claim need not be addressed because the plaintiff's claim fails on procedural grounds.

At least thirty days prior to the filing of the action, a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered, shall be mailed or delivered to any prospective respondent.

M.G.L. c. 93A, § 3.

Such a letter is a absolute prerequisite to an action asserted under G.L. c. 93A, § 9. *Rita v. Carella*, 394 Mass. 822, 824 n. 3, 477 N.E.2d 1016, 1018 n. 3 (1985); *Entrialgo v. Twin City Dodge*, 368 Mass. 812, 813, 333 N.E.2d 202, 204 (1975); *Slaney v. Westwood Auto, Inc.*, 366 Mass. 688, 704, 322 N.E.2d 768, 779 (1975). Ms. Ball has neither alleged that she sent a 30–day demand letter to Wal–Mart nor has she attached such a letter to her complaint. "The failure of the [plaintiff] to allege the sending of a demand letter is fatal to [her] § 9 claim." *City of Boston v. Aetna Life Ins. Co.*, 399 Mass. 569, 574, 506 N.E.2d 106, 109 (1987); *see also McMahon v. Digital Equipment Corp.*, 944 F.Supp. 70, 77 (D.Mass., 1996). Again, Wal–Mart is entitled to the entry of summary judgment.

### F. Negligent Hiring (Count VI)

■ Ms. Ball next alleges in Count VI that Wal–Mart negligently retained James Harris who, in turn, negligently performed his duties [12] to the detriment of the plaintiff.

Negligent retention occurs when, during the course of employment, the employer becomes aware of problems with an employee that indicated his unfitness, and the employer fails to take further action such as investigating, discharge or reassignment.

*Foster v. The Loft, Inc.*, 26 Mass.App.Ct. 289, 291, 526 N.E.2d 1309, 1311 (1988) (bar owner was held liable for negligent hiring and retention of employee resulting in an assault and battery on a patron).

An employer must use due care to avoid retaining an employee whom the employer *"knows or has reason to know* is unworthy by habits, temperament, or nature, to deal with the persons invited to the premises by the employer." *Foster*, 26 Mass.App. Ct. at 290–291, 526 N.E.2d at 1310–1311 (emphasis added).

■ Although negligence is usually a question of fact for the jury, it can be decided as a matter of law when no rational view of the evidence warrants a finding that the defendant was negligent. *Zezuski v. Jenny Mfg. Co.*, 363 Mass. 324, 327, 293 N.E.2d 875, 878 (1973); *see also Irwin v. Ware*, 392 Mass. 745, 764, 467 N.E.2d 1292, 1305 (1984). In this case, the plaintiff has proffered no evidence to suggest that Wal–Mart knew or had reason to know of any condition of Mr. Harris which rendered him unfit.[13] This is an essential element of the plaintiff's case. "A complete failure of proof concerning an essential element of the non-moving party's case renders all other facts immaterial" and mandates summary judgment in favor of the moving party. *Kourouvacilis v. Gen-*

---

**12.** Again, the alleged negligence of Mr. Harris when he confronted Ms. Ball is not specified. The gravamen of Ms. Ball's complaint is the commission of intentional acts by Mr. Harris, amounting to false imprisonment.

**13.** Disciplinary reports from Wal–Mart have been filed by the plaintiff concerning James Harris. These reports are dated March 30, 1998, May 15, 1998, and May 16, 1998 respectively. Because these reports postdate the November 22, 1997, incident with Ms. Ball, they do not show that Wal–Mart had reason to know of James Harris' incompetence at the time of the plaintiff's alleged injury.

*eral Motors Corp.,* 410 Mass. 706, 711, 575 N.E.2d 734, 738 (1991).

In order to prove that Wal–Mart knew or had reason to know of James Harris' incompetence, the plaintiff must show that Wal–Mart had knowledge of past acts of impropriety, violence, or disorder on the part of Mr. Harris.[14] *Foster,* 26 Mass.App. Ct. at 291, 526 N.E.2d at 1311 (1988). The plaintiff has submitted no evidence of prior acts or indiscretions of Mr. Harris that show that Wal–Mart knew or had reason to know of his alleged unfitness. Summary judgment shall enter for the defendant on Count VI.

G. False Imprisonment (Count VIII)

■ Count VIII alleges that Wal–Mart falsely imprisoned Ms. Ball against her will and to her detriment. The tort of false imprisonment consists in the "(1) intentional and (2) unjustified (3) confinement of a person, (4) directly or indirectly (5) of which the person confined is conscious or is harmed by such confinement." *Noel v. Town of Plymouth,* 895 F.Supp. 346, 354 (D.Mass., 1995); *See* Restatement (Second), Torts § 35 (1965); *see also Wax v. McGrath,* 255 Mass. 340, 342, 151 N.E. 317, 318 (1926) (unlawful restraint by force or threat constitutes false imprisonment). The plaintiff's claim of false imprisonment, in this case, turns on whether Ms. Ball was confined.

As Judge Boudin wrote in a recent First Circuit case, "[w]hile 'confinement' can be imposed by physical barriers or physical force, much less will do—although how much less becomes cloudy at the margins." *McCann v. Wal–Mart Stores, Inc.,* 210 F.3d 51, 54 (1 Cir., 2000). In this case, it is fair to say that we are dealing with a situation in the "cloudy margins." In Massachusetts, a review of the cases reveals

that the key factor in determining whether there has been "confinement" is determining whether the person is free to leave.

■ Any restraint, even without physical contact, is sufficient to constitute false imprisonment. "If a [person] is restrained by fear of a personal difficulty, that amounts to false imprisonment within the legal meaning of such term." *Coblyn v. Kennedy's Inc.,* 359 Mass. 319, 321, 268 N.E.2d 860, 861 (1971) (quoting *Jacques v. Childs Dining Hall Co.,* 244 Mass. 438–439, 138 N.E. 843, 843 (1923)). In *Jacques,* the plaintiff while leaving a restaurant with her guest, was told to wait by the cashier and was then asked by the head-waiter to accompany him into the rear of the restaurant for the purposes of ascertaining whether or not she and her guest paid for all of the food they ate. This investigation lasted approximately thirty minutes and was ended when the manager of the restaurant informed her that she could leave. The Supreme Judicial Court found that the investigation by the restaurant amounted to false imprisonment. The plaintiff's veracity and honesty had been openly and repeatedly challenged, so much so that, if the plaintiff had gone out of the restaurant before being exonerated "her departure well might have been interpreted by the lookers-on as an admission of guilt ..." *Jacques,* 244 Mass. at 441, 138 N.E. at 844.

In *Coblyn,* the plaintiff was a patron of a department store. While leaving, he was ordered to a stop by a store employee and was grasped by the arm and told, "You better go back and see the manager." The court found that the defendant had falsely imprisoned the plaintiff as evidenced by the public challenge to the plaintiff's honesty and the physical restraint, demonstrated by the employee's grasp of the

---

**14.** Ms. Ball's answers to the Wal–Mart's interrogatories reveal that a Wal–Mart employee told the plaintiffs that Mr. Harris "has Alzheimer's Disease." (# 47 Exh. C, at 3) This statement is neither relied upon by the plaintiff in making out her claim for negligent hiring nor is it sufficient to show that, at the time of the incident, Wal–Mart knew that Mr. Harris, because of the disease, was unfit. For all that appears, Mr. Harris would have acted in the same manner, i.e., in conformity with company policy, regardless of whether or not he had Alzheimer's disease.

plaintiffs arm. *Coblyn,* 359 Mass. at 320, 268 N.E.2d at 861. *Jacques* and *Coblyn* teach that if the plaintiff gives up the right of locomotion "as the only available alternative to relinquishment of another right, such as the right to an unsullied reputation, is restrained, or imprisoned, in the sense that imprisonment is an element of tortious false imprisonment." *Foley,* 400 Mass. at 91, 508 N.E.2d at 77.

On the other hand, consider the case of *Sweeney v. F.W. Woolworth Co.,* 247 Mass. 277, 281, 142 N.E. 50, 51 (1924). Sweeney was a minor who went into Woolworth's to buy a pencil. When he could not find what he wanted, he started to leave to store. He was about six feet from the outer door when the manager, one Hardie,

> ... came down in front of him and said, "Give up;' that he replied, 'Give up what?" that Hardie said, 'What you took off the counter,' and [Sweeney] answered, 'I didn't take anything;' that Hardie said, 'Yes, you did, *** go down in the cellar,' pointing to the entrance, and [Sweeney] replied, 'No, I won't; I didn't take anything; here is the dime I got from my mother to buy a pencil, and that is all I got;' that hardie then ordered the plaintiff to turn out his pockets; that he replied, 'No, I won't,' and Hardie said, 'Yes, you will;' that the plaintiff said, 'You can turn them out yourself, if you want to,' and Hardie answered, 'No, I won't; I will have an officer down here in a minute if you don't, and arrest you;' that then the plaintiff became frightened, and turned his pockets out, a showed hardie a coupel of handkerchiefs and a dime, and then Hardie said, 'Get out of the store, and never let me see you in it again;' and that the plaintiff then left the store. [Sweeney] further testified that Hardie did not stand between him and the door; that [Sweeney] stood facing the counter with his back toward the street. He also testified that Hardie 'wouldn't let

me move either side. He stood right there. I didn't move at all. He wouldn't let me go near the door.'

*Sweeney,* 247 Mass. 277 at 280, 142 N.E. at 51.

On these facts, the Supreme Judicial Court found no false imprisonment, writing:

> Nor was there anything in what Hardie did to restrain the plaintiff of his liberty. While the plaintiff testified that Hardie would not let him move either side, that he stood right there, that he would not let him go near the door, yet it appears that during the conversation he was standing near the door between it and Hardie, and could have left the store so far as appears, without any interference whatsoever.... [T]here was no evidence that during the brief conversation the plaintiff was prevented by acts of physical force, threats or otherwise from leaving the store at any time. There were no words or conduct which could have induced a reasonable apprehension by the plaintiff, notwithstanding his tender years, that he could not leave defendant's premises without interference if and when he desired to do so.

*Sweeney,* 247 Mass. 277 at 280, 142 N.E. at 51.

Whether or not *Sweeney* was correctly decided on its facts or is good law today,[15] or whether its holding can be squared with the holding in *Jacques* which was decided a year earlier, the holding of *Sweeney* has not been repudiated. In the *Coblyn* case decided in 1971, the Supreme Judicial Court wrote that "[ ]he physical restraint imposed upon the plaintiff when Goss grasped the plaintiff's arms readily distinguishes this case from *Sweeney v. F.W. Woolworth Co.,* 247 Mass. 277, 142 N.E. 50, relied upon by the defendants." *Coblyn,* 359 Mass. at 320, 268 N.E.2d at 861.

█ In the instant case, there is no claim that Mr. Harris ever touched Ms. Ball or that any physical force was applied

**15.** In the *McCann* case, 210 F.3d at 54, Judge Boudin cautions against "attribut[ing] to elderly ... cases an entirely improbable breadth."

to her person. However, Ms. Ball states in her affidavit that Mr. Harris "placed his body up against my cart preventing me from leaving the store." (# 48, Exh. 4, ¶ 5) In addition, there is evidence from which a juror could find, in the verbiage of the Supreme Judicial Court in the *Sweeney* case that the "words and conduct" of Mr. Harris "could have induced a reasonable apprehension by the plaintiff ... that [s]he could not leave the defendant's premises without interference if and when she desired to do so." *Sweeney*, 247 Mass. 277 at 280, 142 N.E. at 51.[16] Ms. Ball's testimony that there were "many persons who had lined up behind [her] ..." while Mr. Harris inspected her bags (# 48, Exh. 4, ¶ 12) and did not just proceed out the front door of the store is additional evidence that a reasonable person would have apprehended that he or she was not free to leave until Mr. Harris concluded his inspection of Ms. Ball and permitted her and the others behind her to leave.

H. Loss of Consortium (Count VII)

Finally, Thomas Ball alleges a loss of the consortium of his wife due to the tortious actions of Wal–Mart. For the reasons already set forth, since the case shall go forward on the tort claims set forth in Counts I and VIII, the claim of loss of consortium in Count VII survives summary judgment.

### VI. Conclusion and Order

For the reasons stated, it is ORDERED that the Defendant's Motion For Summary Judgment (# 46) be, and the same hereby is, ALLOWED as to Counts II, III, IV, V, VI and otherwise DENIED. The case shall stand for trial on Counts I, VII and VIII.

---

16. *See McCann,* 210 F.3d at 54 in which the First Circuit notes that "... the Restatement [and] a practically uniform body of common law in other states ... accepts the mere threat of physical force, or a claim of lawful authority to restrain, as enough to satisfy the confinement requirement for false imprisonment (assuming always that the victim submits)."